62 A.3d 123

**John DOE**

v.

**DEPARTMENT OF PUBLIC SAFETY AND
CORRECTIONAL SERVICES.**

**No. 125, Sept. Term, 2011.**

Court of Appeals of Maryland.

March 4, 2013.

Nancy S. Forster, (Law Office of Nancy S. Forster, Towson, MD; Patricia Cresta–Savage of Law Office of Pat Cresta Savage, Bowie, MD), on brief, for Petitioner.

Stuart M. Nathan, Asst. Atty. Gen., (Douglas F. Gansler, Atty. Gen. of Maryland, Department of Public Safety and Correctional Services, Baltimore, MD), on brief, for Respondent.

Michael P. Lytle, Esq., Law Office of Michael P. Lytle, Esq., Pasadena, MD; James M. Nichols, Esq., Warnken LLC, Towson, MD; Brian M. Saccenti, Esq., Brian L. Zavin, Esq., Asst. Public Defenders, Baltimore, MD, for amici curiae brief of Maryland Criminal Defense Attorney's Association, Families Advocating Intelligent Registries, Inc., and Office of the Public Defender.

Argued before BELL, C.J., HARRELL, GREENE, ADKINS, BARBERA, McDONALD, and JOHN C. ELDRIDGE, (Retired, Specially Assigned), JJ.

GREENE, J.

The Maryland sex offender registration statute, Maryland Code (2001, 2008 Repl.Vol., 2012 Cum.Supp.), § 11–701 *et seq.* of the Criminal Procedure Article (hereinafter all section references to the Criminal Procedure Article of the Maryland Code are identified as "C.P. § "), requires persons convicted of certain sex offenses to register [1] with "the person's super

---

1. In addition to initial registration, this law imposes a number of obligations, restrictions, and consequences upon its registrants, including re-registering periodically with the State, disclosing personal infor-

vising authority." [2] We are asked to determine whether, under this statute, the State can legally require Petitioner to register. Petitioner argues that requiring him to register as a sex offender: (1) violates Petitioner's right to be free from *ex post facto* laws pursuant to both the federal Constitution and the Maryland Declaration of Rights, and to be free from *ex post facto* restrictions pursuant to the Maryland Declaration of Rights; (2) violates Petitioner's due process rights pursuant to both the federal Constitution and the Maryland Declaration of Rights; and (3) violates the plea agreement entered into when he pled guilty to the underlying crime.

During the 1983–84 school year, at the time of Petitioner's commission of the sex offense mentioned herein, the Maryland sex offender registration statute did not exist. The General Assembly enacted the sex offender registration statute in 1995. As a result of amendments to that statute in 2009 and 2010, Petitioner is now required to register as a sex offender. We shall hold that requiring Petitioner to register as a result of the 2009 and 2010 amendments violates the prohibition against *ex post facto* laws contained in Article 17 of the Maryland Declaration of Rights. Pursuant to our determination that Petitioner may not be compelled to register, his name and likeness shall be removed from the Maryland Sex Offender Registry.

---

mation to the State, having personal information disseminated to the public, and requiring permission before going onto school property. *See* C.P. §§ 11–706, 11–707, 11–717, 11–722 (2001, 2008 Repl.Vol., 2012 Cum.Supp.).

**2.** Different registrants must register with different officials depending on the registrant's status. The appropriate "supervising authority" is listed under C.P. § 11–701(n) (2001, 2008 Repl.Vol., 2012 Cum.Supp.). For example, a registrant who is in custody in a facility operated by the Department of Health and Mental Hygiene must register with the Secretary of Health and Mental Hygiene or a registrant who is under the supervision of the Division of Parole and Probation must register with the Director of Parole and Probation, or a registrant who is "not under the supervision, custody, or control of another supervising authority" must register with "the local law enforcement unit where the [registrant] is a resident...." *See* C.P. § 11–701(n) (2001, 2008 Repl. Vol., 2012 Cum.Supp.).

## STATEMENT OF FACTS AND
## PROCEDURAL HISTORY

On June 19, 2006, John Doe[3] ("Petitioner") pled guilty to, and was convicted of, a single count of child sexual abuse under Maryland Code (1957, 1982 Repl.Vol., 1984 Cum.Supp.), Article 27 § 35A.[4] Section 35A(a)(4)(i) prohibited "any act that involves sexual molestation or exploitation of a child by a parent or other person who has permanent or temporary care or custody or responsibility for supervision of a child."

Petitioner's conviction was based on his inappropriate contact with a thirteen-year-old student during the 1983–84 school year when Petitioner was a junior high school teacher. At the time of the incident, allegations concerning Petitioner's misconduct were reported to school officials, the school officials conducted an investigation, and Petitioner resigned from his teaching position at the school. No charges, however, were brought at that time.

Approximately 20 years after the incident, in 2005, a former student contacted law enforcement and reported the sexual abuse that occurred during the 1983–84 school year. According to the State, in 2005, Petitioner was charged with various sex related offenses involving children.

On June 19, 2006, Petitioner and the State presented a plea agreement to the trial judge, which the judge accepted as binding. The agreement called for Petitioner to plead guilty to one count of child sexual abuse, a crime that carried a maximum sentence of fifteen years incarceration. In exchange for the guilty plea, the agreement (1) provided for a pre-sentence investigation; (2) allowed Petitioner to remain on bond until the sentencing date; (3) established a five-year cap

---

3. John Doe is a pseudonym used after Petitioner successfully moved to have his name stricken from the record.

4. The crime of child sexual abuse, since 1984, has been re-codified as Md.Code. Art. 27, § 35C, and then again as Section 3–601 of the Criminal Law Article, and then finally as Section 3–602 of the Criminal Law Article, where it is currently codified. *See* 1994 Md. Laws, Chap. 712; 2002 Md. Laws, Chaps. 26 and 273.

on the actual term of incarceration the trial court could impose, allowing Petitioner to argue for a reduced sentence; and (4) provided that the State would not pursue the other outstanding charges or any subsequent related uncharged crimes. The agreement did not, however, address registration as a sex offender. After accepting the binding plea agreement, the trial judge entered a conviction and ordered a presentence investigation.

Petitioner's sentencing hearing was held on September 6, 2006. Before imposing sentence, the trial judge explained to Petitioner:

> I am impressed with the life that you have lived since being relieved of your responsibilities as a teacher.... I'm also impressed by some of the difficulties that you've experienced in your life and the responsibility that you showed to your family and the responsibility that you've shown to others [ever] since that time. So the [court] is certainly taking into consideration all of the things that you have done of a positive nature since the time of this incident back in the 1980s. And what has been also said is true that rehabilitation is one of the factors that the [trial court] must look at, *and you appear to have rehabilitated yourself significantly since the time of this incident.*

(Emphasis added). The trial judge then stated, however, that "there are other things the [trial court] must consider, such as, the nature of the crime." The trial judge noted that "[c]hild abuse is a very serious and heinous crime" and that the victim was a "child" and a "student." The trial judge stated:

> Retribution is also a valid factor, punishment for punishment's sake, as well as general deterrence, that is to prevent and deter others from committing acts such as this. Once again, these are just as valid as rehabilitation, specific deterrence, that is, to prevent [Petitioner] from committing an act such as this again, *which I don't think will occur.*

(Emphasis added). The trial judge imposed a sentence of ten years incarceration, with all but four and one half years suspended, and three years supervised probation upon release from incarceration. As one of the conditions of Petitioner's

probation, he was ordered to "register as a child sex offender." Additionally, the trial judge ordered Petitioner to pay court costs and a fine of $500.

Approximately one month later, Petitioner filed a Motion to Correct an Illegal Sentence challenging the $500 fine and the requirement that he register as a child sex offender. Petitioner argued that the trial court "lacked authority to require [Petitioner] to register as a child sex offender." Petitioner noted that the Maryland sex offender registration statute that was in effect at that time applied retroactively to a child sex offender who committed his or her offense on or before October 1, 1995, *if* the offender was "under the custody or supervision of the supervising authority on October 1, 2001." Petitioner contended that he could not be required to register because "[t]here was no registry at the time of the instant offense and the law, as written, [did] not apply retroactively to [Petitioner]" because he "was indisputably not under the custody or supervision of the supervising authority on October 1, 2001 as that term is defined in the statute." Additionally, Petitioner asserted that the fine was "not a permitted penalty under [the law he was convicted for violating]." On November 1, 2006, the Circuit Court agreed with Petitioner and issued an order striking the fine and the requirement that Petitioner register as a child sex offender.

In December 2008, Petitioner was released early from prison. In 2009, the Maryland General Assembly passed a new law, effective October 1, 2009, changing the sex offender registration requirements. *See* C.P. § 11–701 *et seq.* (2001, 2008 Repl.Vol., 2009 Cum.Supp.); 2009 Md. Laws, Chap. 541. The new sex offender registration statute retroactively required a child sex offender who committed a sex offense prior to October 1, 1995, but was convicted on or after October 1, 1995, and had not previously been required to register under Maryland law, to now register as a child sex offender. C.P. § 11–702.1(c)(ii) (2001, 2008 Repl.Vol., 2009 Cum.Supp.). Petitioner testified that on October 1, 2009, Petitioner's probation officer directed Petitioner, under threat of "arrest[ ] and incarcerat[ion]," to register as a child sex offender. Petitioner

maintains that he did not agree with the requirement, but registered, against the advice of counsel, as a child sex offender in early October 2009.

In 2010, the Maryland General Assembly again amended the sex offender registration statute re-categorizing Petitioner, based upon his prior conviction, as a Tier III sex offender. C.P. §§ 11–701(q)(1)(ii), 11–704(a)(3) (2001, 2008 Repl.Vol., 2010 Cum.Supp.); 2010 Md. Laws, Chaps. 174 and 175. As a result of the 2010 amendment, generally, sex offenders are designated by tiers. *See* C.P. § 11–701(*l*) (2001, 2008 Repl. Vol., 2012 Cum.Supp.). Tier III is the most severe designation requiring lifetime registration, as opposed to Tier II offenders who register for 25 years or Tier I offenders who register for 15 years. *See* C.P. § 11–707(a)(4) (2001, 2008 Repl.Vol., 2012 Cum.Supp.). Additionally, Tier III offenders must re-register every three months, while Tier I and Tier II offenders are required to reregister every 6 months. C.P. § 11–707(a) (2001, 2008 Repl.Vol., 2012 Cum.Supp.).

In October 2009, in a separate civil proceeding, Petitioner filed in the Circuit Court for Anne Arundel County a Complaint for a Declaratory Judgment seeking a declaration that he not be required to register as a sex offender under the Maryland sex offender registration statute, and that he be removed from the Maryland Sex Offender Registry. Petitioner's Complaint advanced three arguments, including that to require him to register, when he was not informed of that requirement when he pled guilty, would improperly render his guilty plea involuntary. None of the arguments advanced in the Complaint, however, explicitly addressed the constitutionality of the registration requirement. After the State's successful "Motion for Transfer of Action," the case was transferred to the Circuit Court for Washington County, the county where Petitioner committed his crime, pled guilty, and was sentenced. During the Circuit Court proceedings, the parties addressed the issues presented in Petitioner's Complaint. In addition, counsel for the State [5] argued to the court that

---

**5.** Although Petitioner named the Department of Public Safety and Correctional Services, an agency of the State, the defendant in this

requiring Petitioner to register did not violate the prohibition against *ex post facto* laws. At the end of the hearing, the trial judge denied Petitioner's request for declaratory relief and ordered that Petitioner "shall not be removed from the sex offender registry." [6]

Petitioner noted an appeal to the Court of Special Appeals. In Petitioner's appeal, he once again contended that requiring him to register as a sex offender violated the terms of the plea agreement. In addition, Petitioner explicitly advanced challenges to the application of the statute on *ex post facto*, bill of attainder, equal protection, and due process grounds. The State argued that Petitioner failed to raise the four constitutional arguments in his Complaint and, hence, the arguments were not preserved for appeal. The intermediate appellate court determined that the due process and *ex post facto* arguments were properly raised in the trial court and, therefore, addressed them. The Court of Special Appeals, however, determined that the equal protection and bill of attainder arguments were not properly raised in the trial court and, accordingly, did not consider those issues. In an unreported opinion, the intermediate appellate court rejected all of Petitioner's arguments and affirmed the trial court's judgment requiring Petitioner to remain on the Maryland Sex Offender Registry. We issued a writ of *certiorari* in the present case, 425 Md. 227, 40 A.3d 39 (2012), to consider the following three questions:

1. Given the highly punitive and restrictive nature of Maryland's newly enacted sex offender registration laws, does their retroactive application violate the federal constitutional ban on *ex post facto* laws and **both** clauses of Article 17 of

---

action, the State of Maryland is actually defending the lawsuit. Therefore, we shall refer to the State as Respondent in this opinion.

**6.** We note that the trial judge did not have discretion to deny Petitioner declaratory relief. Technically, to comply with the Declaratory Judgments Act, the court was required to declare the parties' rights in light of the issues raised. *See Jennings v. Government Employees Ins. Co.,* 302 Md. 352, 355–56, 488 A.2d 166, 167–68 (1985).

the Maryland Declaration of Rights prohibiting *ex post facto* laws and *ex post facto* restrictions? [7]

2. Do Maryland's sex offender registration laws violate Mr. Doe's federal and state constitutional rights to due process?

3. Given that the plea agreement entered into by Mr. Doe did not, and indeed could not have, contemplated registering as a sex offender, is he entitled to specific performance of the plea agreement?

## DISCUSSION

As a preliminary matter, we shall address both parties' contentions that this Court should not consider certain arguments. First, the State asserts in its brief to this Court that Petitioner did not raise the *ex post facto* issue in his Complaint, and therefore, this Court, on review of the case, should not consider the issue. We reject this argument. Maryland Rule 8–131(a) provides that "[o]rdinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been *raised in or decided* by the trial court...." Md. Rule 8–131(a) (emphasis added). As noted recently in *Duckett v. Riley*, 428 Md. 471, 476, 52 A.3d 84, 87 (2012) (quotation omitted), "to ascertain the meaning of a ... rule of procedure we first look to the normal, plain meaning of the language." The use of the word "or" indicates that an issue must be raised in or decided by the trial court, but it is not necessary for both to occur to preserve the issue for appellate review. The *ex post facto* issue was raised in the trial court and addressed by both the State and the trial

---

7. Consistent with our prior analysis of the *ex post facto* prohibition, we conclude that requiring Petitioner to register violates the prohibition against *ex post facto* laws under Article 17. Therefore, we need not, and do not, reach the question whether the language contained in Article 17, "nor any retrospective oath or restriction be imposed, or required[,]" would give rise to a separate ground for finding the application of the sex offender registration statute unconstitutional under Article 17.

judge.[8]  The issue was then raised in the Court of Special Appeals.  Accordingly, the *ex post facto* issue is plainly preserved for our review.

Second, Petitioner includes in his Reply Brief to this Court a Motion to Strike the State's argument that federal law precludes "Maryland courts from granting [Petitioner] the relief he seeks. . . ."  The State contends, in its brief to this Court, that the federal Sex Offender Registration and Notification Act, SORNA, 42 U.S.C. § 16901 *et. seq.,* imposes upon Petitioner an "independent obligation to register as a Tier III sex offender."  The State therefore, asserts that this Court cannot grant Petitioner the relief he seeks, "an order exempting [Petitioner] from an obligation to register as a Tier III sex offender."  Petitioner specifically notes in his brief to this Court that he is challenging his registration requirements imposed by Maryland law, not federal law.  Thus, the question of whether Petitioner is required to comply with federal law and what is required of Petitioner to comply is not before this Court.  As Petitioner's federal obligations are not before us, we need not, and do not, address the issue of whether they require him to independently register.

Moreover, Petitioner seeks ultimately a declaration exempting him from the obligation to register under the Maryland sex offender registration statute.  We have held that a declar-

---

**8.**  During the hearing on the "Complaint for Declaratory Judgment," counsel for the State, Mr. Nathan, argued that the State can change a law to apply it retroactively.  In response, the trial judge noted that "this [is] a question whether [ ] the requirement of the registration is punishment or a collateral consequence," alluding to a potential *ex post facto* issue.  Mr. Nathan addressed the potential *ex post facto* issue arguing that in *Young v. State,* 370 Md. 686, 806 A.2d 233 (2002), this Court determined that sex offender registration was not a punishment.  Mr. Nathan went on to argue that in *Smith v. Doe,* 538 U.S. 84, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003), the United States Supreme Court held that the Alaskan sex offender registration statute did not violate the federal *ex post facto* clause.  Then, later in the hearing, he argued:

There are no constitutional violations [from imposing registration upon Petitioner].  As I said, the General Assembly is well within its rights to. . . . to enact statutes requiring retroactive registration.  The appellate courts in this State have upheld that.  There is no *ex post facto* implication.

atory judgment is appropriate when there is an actual controversy between the parties and the declaratory judgment will terminate the conflict. *See Green v. Nassif,* 426 Md. 258, 292–93, 44 A.3d 321, 341–42 (2012); *Ocean Petroleum, Co. v. Yanek,* 416 Md. 74, 81–82, 5 A.3d 683, 687–88 (2010); Md.Code (1973, 2006 Repl.Vol.), § 3–409 of the Courts and Judicial Proceedings Article. In the present case, Petitioner is currently registered as a sex offender and is threatened with criminal prosecution, should he fail to comply with the law, under a Maryland statute that he claims is unconstitutional as applied to him. *See Grimm v. County Comm'rs of Washington County,* 252 Md. 626, 632–33, 250 A.2d 866, 869 (1969) (citations omitted). In light of this actual controversy between the parties, a determination of whether the statute is unconstitutional as applied to Petitioner, and whether he should be removed from the Sex Offender Registry, will resolve the conflict. Therefore, pursuant to Maryland law, entry of a declaratory judgment would be proper and to do so would not require this Court to construe federal law with respect to SORNA.

## I. The Sex Offender Registration Statute in Maryland

In order to address the *ex post facto* issue, it is necessary to provide some relevant history of sex offender registration in Maryland. In 1995, the Maryland General Assembly first enacted the Maryland sex offender registration statute. *State v. Duran,* 407 Md. 532, 546–47 n. 7, 967 A.2d 184, 192 n. 7 (2009) (quotation omitted); 1995 Md. Laws, Chap. 142. As enacted, the statute applied prospectively to sex offenders who committed their crimes after the statute went into effect on October 1, 1995. *See* 1995 Md. Laws, Chapter 142, § 3.

In 2001, the sex offender registration statute was amended and was applied retrospectively to different groups of sex offenders,[9] including "a child sex offender who committed [his

---

9. In the time since the Maryland sex offender registration statute went into effect in 1995, there have been a number of amendments to the statute. *See e.g.* Md.Code (1957, 1996 Repl.Vol., 1997 Cum.Supp.), Art.

or her] sexual offense on or before October 1, 1995" if that offender was "under the custody or supervision of the supervising authority on October 1, 2001." C.P. § 11–702.1 (2001); 2001 Md. Laws, Chap. 221.

In 2009, the retroactive application of the statute was once again amended and registration was required of a child sex offender who committed his or her crime before October 1, 1995 but was convicted on or after October 1, 1995, irrespective of when the offender was incarcerated or under supervision. *See* C.P. § 11–702.1 (2001, 2008 Repl.Vol., 2009 Cum. Supp.); 2009 Md. Laws, Chap. 541.

In 2010, the sex offender registration statute was amended again, and among other things, the amendment addressed the retroactive application of the statute. *See* C.P. § 11–702.1 (2001, 2008 Repl.Vol., 2010 Cum.Supp.); 2010 Md. Laws, Chaps. 174 and 175. The 2010 amendment required retroactive registration of all persons who were already required to register on September 30, 2010, the day before the amendment went into effect. *See* C.P. § 11–702.1(a)(2) (2001, 2008 Repl.Vol., 2010 Cum.Supp.). This language had the consequence of incorporating the retroactive application of the statute as amended in 2009.

Petitioner committed the underlying child sex offense during the 1983–84 school year, long before 1995. He was not under custody or supervision of the State until after he was charged with the relevant offense in 2005. Therefore, Petitioner is required to register as a sex offender pursuant to the 2009 and 2010 amendments' retroactive application of the sex offender registration statute.

───────

27, § 792; Md.Code (1957, 1996 Repl.Vol., 1998 Cum.Supp.), Art. 27, § 792; Md.Code (1957, 1996 Repl.Vol., 1999 Cum.Supp.), Art. 27, § 792; C.P. § 11–701 *et seq.* (2001). As this opinion addresses whether the 2001, 2009, and 2010 amendments to the Maryland sex offender registration statute, applied retroactively to a child sex offender, violates the prohibition against *ex post facto* laws, we focus on those changes.

## II. Constitutional Argument

Petitioner argues that "[g]iven their highly punitive and restrictive nature, retroactive application of Maryland's sex offender registration laws violates the federal constitutional ban on *ex post facto* laws [10] and both clauses of Article 17 of the Maryland Declaration of Rights prohibiting *ex post facto* laws and *ex post facto* restrictions." In response, the State contends that "[t]he Court of Special Appeals correctly concluded that the Maryland [sex offender registration statute] does not violate either the federal or State . . . prohibitions on ex post facto laws." We conclude, however, that requiring Petitioner to register as a sex offender violates Article 17's prohibition against *ex post facto* laws; thus, we need not, and do not, address whether requiring Petitioner to register violates the prohibition against *ex post facto* laws under Article 1 of the federal Constitution.[11]

Furthermore, in determining that the retroactive application of the statute violates Article 17, we need not, and do not, address whether requiring Petitioner to register affects his

---

10. "Article I, Section 10 of the Constitution of the United States provides in part that 'no State shall ... pass any ... ex post facto Law....'" *Khalifa v. State,* 382 Md. 400, 424, 855 A.2d 1175, 1189 (2004).

11. In *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), the United States Supreme Court held:

   If a state court chooses merely to rely on federal precedents as it would on the precedents of all other jurisdictions, then it need only make clear by a plain statement in its judgment or opinion that the federal cases are being used only for the purpose of guidance, and do not themselves compel the result that the court has reached. In this way, both justice and judicial administration will be greatly improved. If the state court decision indicates clearly and expressly that it is alternatively based on bona fide separate, adequate, and independent grounds, [the United States Supreme Court], of course, will not undertake to review the decision.

   463 U.S. at 1041, 103 S.Ct. at 3476, 77 L.Ed.2d at 1214. Our judgment is based exclusively upon our interpretation of the protections afforded by Article 17 of Maryland's Declaration of Rights. *See Frankel v. Board of Regents,* 361 Md. 298, 313–14 n. 3, 761 A.2d 324, 332 n. 3 (2000) (citations omitted); *see also Marshall v. State,* 415 Md. 248, 260, 999 A.2d 1029, 1035–36 (2010) (citations omitted).

constitutional due process rights. We further offer no opinion on whether registration is a valid form of punishment under the Maryland Constitution or whether the other constitutional rights of registrants are affected by having to register as a sex offender under the Maryland sex offender registration statute. *See Smith v. Doe,* 538 U.S. 84, 114, 123 S.Ct. 1140, 1158–59, 155 L.Ed.2d 164, 190–91 (2003) (Stevens, J., dissenting) (concluding that the retroactive application of the Alaska sex offender registration statute violates the prohibition on *ex post facto* laws but does not give rise to a right to additional procedural safeguards under the Due Process Clause).

### A. We examine Petitioner's contention pursuant to Article 17 of the Maryland Declaration of Rights.

Article 17 of the Maryland Declaration of Rights provides:

That retrospective Laws, punishing acts committed before the existence of such Laws, and by them only declared criminal, are oppressive, unjust and incompatible with liberty; wherefore, no *ex post facto* Law ought to be made; nor any retrospective oath or restriction be imposed, or required.

Md. Decl. of Rts., Art. 17.

In the past, we have read the protection against *ex post facto* laws in Article 17 of the Declaration of Rights *in pari materia* with, or as generally having the same meaning as the *Ex Post Facto* Clause in Article 1 of the federal Constitution. *See Dep't of Public Safety and Corr. Serv. v. Demby,* 390 Md. 580, 608, 890 A.2d 310, 327 (2006) (citations omitted); *Khalifa v. State,* 382 Md. 400, 425, 855 A.2d 1175, 1189 (2004) (citations omitted); *Evans v. State,* 382 Md. 248, 280 n. 13, 855 A.2d 291, 310 n. 13 (2004) (citations omitted). We have indicated, however, that this Court will not always limit the protection provided by Article 17 to that which is provided by the federal Constitution. In *Allstate Ins. Co. v. Kim,* 376 Md. 276, 289–90, 829 A.2d 611, 618–19 (2003), we explained that when determining if the retroactive application of a statute "contravene[s] some Constitutional right or prohibition," including

"violat[ing] the prohibition against *ex post facto* laws," we must consider *both* the federal and state protections because the standards may be different. Petitioner urges this Court to "join the growing number of states relying on their own constitutions to find [the retroactive application of sex offender registration] violative of *ex post facto* prohibitions." [12]

Throughout our case law, we have recognized that, in many contexts, the protections provided by the Maryland Declaration of Rights are broader than the protections provided by the parallel federal provision. As we have stated:

Many provisions of the Maryland Constitution ... do have counterparts in the United States Constitution. We have often commented that such state constitutional provisions are *in pari materia* with their federal counterparts or are the equivalent of federal constitutional provisions or *generally* should be interpreted in the same manner as federal provisions. Nevertheless, we have also emphasized that, simply because a Maryland constitutional provision is *in pari materia* with a federal one or has a federal counterpart, does *not* mean that the provision will *always* be interpreted or applied in the same manner as its federal counterpart. Furthermore, cases interpreting and applying a federal constitutional provision are only persuasive authority with respect to the similar Maryland provisions.

*Dua v. Comcast Cable,* 370 Md. 604, 621, 805 A.2d 1061, 1071 (2002) (emphasis in original); *see also Attorney General v. Waldron,* 289 Md. 683, 714, 426 A.2d 929, 946 (1981) (citation omitted) ("Although the equal protection clause of the fourteenth amendment and the equal protection principle embodied in Article 24 [of the Maryland Declaration of Rights] are

---

**12.** The highest courts in Alaska and Indiana have concluded that a retroactive application of their state's own sex offender registration statute violates their respective state constitution's prohibition against *ex post facto* laws. *See Doe v. State,* 189 P.3d 999 (Alaska 2008); *Wallace v. State,* 905 N.E.2d 371 (Ind.2009). Additionally, the highest court in Ohio determined that the retroactive application of changes to Ohio's sex offender registration statute violates the Ohio constitution's prohibition against "retroactive laws." *See State v. Williams,* 129 Ohio St.3d 344, 952 N.E.2d 1108 (2011).

'in pari materia,' and decisions applying one provision are persuasive authority in cases involving the other, we reiterate that each provision is independent, and a violation of one is not necessarily a violation of the other."); *Green v. Zendrian,* 916 F.Supp. 493, 497–98 n. 3 and n. 4 (D.Md.1996) (quoting *Murphy v. Edmonds,* 325 Md. 342, 354–55, 601 A.2d 102, 108 (1992)) (stating both that "the [Maryland] Court [of Appeals] has repeatedly held that state and federal provisions *in pari materia* are 'obviously independent and capable of divergent application[,]' " and that "[a] Maryland court has greater latitude than this [federal court] to decline to follow the [United States] Supreme Court's interpretation of the Maryland Declaration of Rights").[13]

In other contexts, we have ensured that the rights provided by Maryland law are fully protected by departing from the United States Supreme Court's analysis of the parallel federal right. *See Frey v. Comptroller of the Treasury,* 422 Md. 111, 177, 29 A.3d 475, 513 (2011) ("[E]ven though we have already determined that the [challenged tax] does not violate the Equal Protection Clause of the federal Constitution, we must address separately whether, under the applicable Maryland authorities, that tax violates the State's equal protection guarantee."); *Parker v. State,* 402 Md. 372, 399, 936 A.2d 862, 878 (2007) (determining that if under the United States Supreme Court's interpretation of federal law, the Fourth Amendment's

---

**13.** In his article, *State Constitutions and the Protection of Individual Rights,* 90 Harv. L.Rev. 489 (1977), United States Supreme Court Justice William J. Brennan Jr. noted that "state courts no less than federal are and ought to be the guardians of our liberties[,]" and counseled that "[S]tate courts cannot rest when they have afforded their citizens the full protections of the federal Constitution. State constitutions, too, are a font of individual liberties, their protections often extending beyond those required by the [United States] Supreme Court's interpretation of federal law." 90 Harv. L.Rev. at 491. Justice Brennan appealed to State courts to remember:

[T]he decisions of the [United States Supreme] Court are not, and should not be, dispositive of questions regarding rights guaranteed by the counterpart provisions of state law. Accordingly, such decisions are not mechanically applicable to state law issues, and state court judges and the members of the bar seriously err if they so treat them.

90 Harv. L.Rev. 502 (footnote omitted).

exclusionary rule does not apply to violations of the "knock and announce" rule, under "the peculiar circumstances" of that case, the evidence was still excludable if it violated Maryland's "knock and announce" rule); *Hardaway v. State*, 317 Md. 160, 163, 166–67, 169, 562 A.2d 1234, 1235, 1237, 1238 (1989) (determining that while the United States Supreme Court held that "giving a 'no adverse inference' instruction over a defendant's objection does not violate the defendant's Fifth Amendment privilege against self-incrimination," giving the instruction over defendant's objection in that case did violate Maryland's protections against self-incrimination); *Choi v. State*, 316 Md. 529, 535–36 n. 3, 545, 560 A.2d 1108, 1111 n. 3, 1115 (1989) (concluding that, while in only two previous situations had Article 22 of the Declaration of Rights been read to provide broader protections against being compelled to make a self-incriminating statement than the Fifth Amendment to the federal Constitution, under the facts of that case, "[E]ven if [the petitioner] had waived her Fifth Amendment privilege, she certainly did not waive her privilege against compelled self-incrimination under Art[icle] 22 of the Maryland Declaration of Rights.").

We are persuaded, in the present case, to follow our long-standing interpretation of the *ex post facto* prohibition and depart from the approach taken by the United States Supreme Court when it analyzed the Alaskan sex offender registration statute in *Smith v. Doe*, 538 U.S. 84, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003). In *Collins v. Youngblood*, 497 U.S. 37, 50, 110 S.Ct. 2715, 2723, 111 L.Ed.2d 30, 44 (1990), the United States Supreme Court rejected the "disadvantage" standard, which, as noted below, was articulated in *Kring v. Missouri*, 107 U.S. 221, 235, 2 S.Ct. 443, 455, 27 L.Ed. 506, 511 (1883), and *Weaver v. Graham*, 450 U.S. 24, 29, 33–34, 101 S.Ct. 960, 964, 966–67, 67 L.Ed.2d 17, 23, 26 (1981), and adopted by this Court in *Anderson v. Dep't of Health & Mental Hygiene*, 310 Md. 217, 224, 226–27, 528 A.2d 904, 908, 909 (1987). We, however, have not abandoned the "disadvantage" analysis. Repeatedly in cases where we have addressed the *ex post facto* prohibition since the Supreme Court decided *Collins*, we have said, the "two critical elements" that "must

be present" for a law to be unconstitutional under the *ex post facto* prohibition are that the law is retroactively applied and the application disadvantages the offender. In those cases, we have continued to express the *ex post facto* prohibition in terms of the disadvantages to the offender. Although the Supreme Court appears to have narrowed the scope of the federal Constitution's protection against *ex post facto* laws, we elect to follow the principle of *stare decisis* and continue to interpret Article 17 as offering broader protection.

The prohibition against *ex post facto* laws is rooted in a basic sense of fairness, namely that a person should have "fair warning" of the consequences of his or her actions and that a person should be protected against unjust, oppressive, arbitrary, or vindictive legislation. *See Demby,* 390 Md. at 608–09, 890 A.2d at 327 (citations and quotations omitted) (noting that there are "[t]wo paramount protections" provided by prohibitions against *ex post facto* laws; "the assurance that legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed," and a restriction on "governmental power by restraining arbitrary and potentially vindictive legislation"); *Khalifa,* 382 Md. at 425, 855 A.2d at 1189 (emphasis and quotations omitted) (noting that the basis for *ex post facto* protections is to "assure that legislative Acts give fair warning of their effect[,]" and to "protect[ ] liberty by preventing governments from enacting statutes with manifestly unjust and oppressive retroactive effects"); *see also Lewis v. State,* 285 Md. 705, 713, 404 A.2d 1073, 1077 (1979) (citations omitted) (concluding that because a procedural rule, as it existed at the time of the defendant's trial, precluded the trial from going forward, even if this Court were to change the rule, we would do so prospectively because "Although it might not violate constitutional requirements to now modify the common law rule and apply such change retroactively to validate the defendant's unlawful trial, to do so may, in our view, impinge upon basic fairness."); *Commonwealth v. Murphy,* 389 Mass. 316, 451 N.E.2d 95, 99 (1983) (recognizing that "the concept underlying the prohibition against ex post facto laws is ... based on fundamental fairness").

Based on principles of fundamental fairness and the right to fair warning within the meaning of Article 17, retrospective application of the sex offender registration statute to Petitioner is unconstitutional. As noted above, Petitioner committed his sex offense during the 1983–84 school year. The Maryland sex offender registration statute did not go into effect until over a decade later in 1995. As a result of the 2009 and 2010 amendments to the statute, the registration requirements were applied retroactively to Petitioner. He could not have had fair warning that he would be required to register. In fact, during the 2010 trial court proceedings in the present case, the trial judge, who also presided over Petitioner's original sentencing four years earlier, stated "no one could have anticipated, I certainly didn't in 2006, that in 2009, the law would change to require someone to register if an offense had occurred during the time period that it did occur in this particular case." If in 2006, "no one could have anticipated" that Petitioner would be required to register, he could hardly have had fair warning of the requirement two decades earlier. Petitioner could not have had fair warning of, and should not face, any legally imposed sanctions beyond those provided for at the time of the commission of his crime. *Cf. Khalifa*, 382 Md. at 426, 855 A.2d at 1190 (determining that the application of a law did not violate the *ex post facto* prohibition in part because it gave "fair warning" of its effect). Ensuring this protection is especially vital in this case because a sex offender registration statute "imposes significant affirmative obligations and a severe stigma on every person to whom it applies." *Wallace v. State*, 905 N.E.2d 371, 379 (Ind.2009).

Consistent with our precedent and the principles of fairness that underlie the *ex post facto* prohibition, we elect to diverge from limiting Article 17's protections to only those provided by federal law. In *Anderson v. Dep't of Health & Mental Hygiene*, 310 Md. 217, 528 A.2d 904 (1987), we were asked to determine whether a change in the law making it harder for a person to be released from a mental hospital, to which he had been committed as a result of a criminal conviction, violated both Article 17 and the federal prohibition against *ex post facto* laws. We first stated that both the federal and Mary-

land *ex post facto* prohibitions relate to "criminal or penal laws *or the consequences of an offense.*" 310 Md. at 223, 528 A.2d at 907 (emphasis added). After noting that limitation, we concluded that the change in the law violated both prohibitions against *ex post facto* laws, by adopting the standard the United States Supreme Court applied when analyzing a federal *ex post facto* allegation in *Kring,* 107 U.S. at 235, 2 S.Ct. at 455, 27 L.Ed. at 511, namely that the prohibition "extends broadly to any law passed after the commission of an offense which ... in relation to that offense, *or its consequences,* alters the situation of a party to his disadvantage[.]" 310 Md. at 224, 528 A.2d at 908 (emphasis in original) (quotations omitted).

In *Anderson,* we found further support for the "disadvantage" standard in four other United States Supreme Court cases: *Miller v. Florida,* 482 U.S. 423, 430–31, 107 S.Ct. 2446, 2451–52, 96 L.Ed.2d 351, 360–61 (1987); *Weaver,* 450 U.S. at 29, 33, 101 S.Ct. at 964, 966–67, 67 L.Ed.2d at 23, 26; *Lindsey v. Washington,* 301 U.S. 397, 401–02, 57 S.Ct. 797, 799, 81 L.Ed. 1182, 1186 (1937); and *In re Medley,* 134 U.S. 160, 171, 10 S.Ct. 384, 387, 33 L.Ed. 835, 840 (1890). 310 Md. at 226–27, 528 A.2d at 909. Three years later, in the 1990 case, *Gluckstern v. Sutton,* 319 Md. 634, 574 A.2d 898 (1990), we relied on this Court's opinion in *Anderson* and the Supreme Court's decisions in *Medley, Lindsey,* and *Weaver,* and held that a law making it more difficult for a person confined at the Patuxent Institution to be paroled violated Article 17 and Article 1 of the federal Constitution because it "clearly operated to [the offender's] disadvantage." 319 Md. at 664–67, 669, 574 A.2d at 912–14, 915.

Two weeks after this Court issued *Gluckstern,* the United States Supreme Court overruled *Kring,* and disavowed the notion that the federal "*Ex Post Facto* Clause ... include[s] ... any change which alters the situation of a party to his disadvantage." *Collins v. Youngblood,* 497 U.S. 37, 50, 110 S.Ct. 2715, 2723, 111 L.Ed.2d 30, 44 (1990) (quotation omitted). Rather, the Supreme Court limited the prohibition against *ex post facto* laws to only the categories enumerated in *Calder v.*

*Bull,* 3 U.S. (3 Dall.) 386, 1 L.Ed. 648 (1798).[14]  497 U.S. at 50, 110 S.Ct. at 2723, 111 L.Ed.2d at 44.  The Supreme Court has explained the effect of *Collins* on the federal Constitution's prohibition against *ex post facto* laws:

> Our opinions in *Lindsey, Weaver,* and *Miller* suggested that enhancements to the measure of criminal punishment fall within the *ex post facto* prohibition because they operate to the "disadvantage" of covered offenders. . . . But that language was unnecessary to the results in those cases and is inconsistent with the framework developed in *Collins v. Youngblood* . . . . After *Collins,* the focus of the *ex post facto* inquiry is not on whether a legislative change produces some ambiguous sort of "disadvantage," . . . but on whether any such change alters the definition of criminal conduct or increases the penalty by which a crime is punishable.

*California Dep't of Corr. v. Morales,* 514 U.S. 499, 506–07 n. 3, 115 S.Ct. 1597, 1602 n. 3, 131 L.Ed.2d 588, 595 n. 3 (1995) (citations omitted).  In *Collins* and *Morales,* the Supreme Court abandoned the standard that the protection against *ex post facto* laws extends to laws, retroactively applied, that act to the disadvantage of the offender.  We, however, have continued to interpret the prohibition against *ex post facto* laws, like the Supreme Court had in past cases, such as in *Weaver* and *Kring,* as protecting against laws, which, when retroactively applied, disadvantaged an offender.  *See Dep't of Public Safety and Corr. Servs. v. Demby,* 390 Md. 580, 609, 890 A.2d 310, 327 (2006); *Khalifa,* 382 Md. at 426, 855 A.2d at 1189–90; *Frost v. State,* 336 Md. 125, 136, 647 A.2d 106, 112 (1994).

---

**14.**  Those four categories are:  (1) "[e]very law that makes an action done before the passing of the law, and which was *innocent* when done, criminal; and punishes such action[;]" (2) "[e]very law that *aggravates* a *crime,* or makes it *greater* than it was, when committed[;]" (3) "[e]very law that *changes the punishment,* and inflicts a *greater punishment,* than the law annexed to the crime, when committed[;]" and (4) "[e]very law that alters the *legal* rules of *evidence,* and receives less, or different, testimony, than the law required at the time of the commission of the offence, *in order to convict the offender." Calder v. Bull,* 3 U.S. (3 Dall.) 386, 390, 1 L.Ed. 648, 650 (1798) (emphasis in original).

Four years after the *Collins* opinion, in a 1994 case, *Frost v. State,* we again looked to *Weaver* as persuasive authority when determining if a law violated both Article 17's and the federal Constitution's prohibition against *ex post facto* laws. Quoting *Weaver,* we stated that "[t]wo critical elements must be present for a criminal or penal law to be *ex post facto:* it must be retrospective, that is, it must apply to events occurring before its enactment, and it must *disadvantage* the offender affected by it." 336 Md. at 136, 647 A.2d at 112 (emphasis added) (quoting *Weaver,* 450 U.S. at 29, 101 S.Ct. at 964, 67 L.Ed.2d at 23).

In 2003, in *Smith v. Doe,* 538 U.S. 84, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003), the United States Supreme Court employed a different approach when it analyzed whether the retroactive application of the Alaskan sex offender registration statute violated the federal *ex post facto* prohibition. In determining that it did not, the Supreme Court applied a two-part analysis to conclude that the Alaskan statute did not "constitute[ ] retroactive punishment forbidden by the *Ex Post Facto* Clause." 538 U.S. at 92, 105–06, 123 S.Ct. at 1146, 1154, 155 L.Ed.2d at 176, 185. First, the Court determined "that the intent of the Alaska Legislature [in enacting Alaska's sex offender registration statute] was to create a civil, nonpunitive regime." 538 U.S. at 96, 123 S.Ct. at 1149, 155 L.Ed.2d at 179. Because the Supreme Court concluded that the Alaskan legislature intended the statute to be "civil," the Court next examined whether there was "the clearest proof" that the Alaskan sex offender registration statute was "so punitive either in purpose or effect as to negate [Alaska's] intention to deem it civil." 538 U.S. at 92, 123 S.Ct. at 1147, 155 L.Ed.2d at 176 (quotations omitted). Using the factors articulated in *Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 168–69, 83 S.Ct. 554, 567–68, 9 L.Ed.2d 644, 661 (1963), the Supreme Court determined that the party challenging the retroactive application of the statute "[could not] show, much less by the clearest proof, that the effects of the law negate Alaska's intention to establish a civil regulatory scheme[,]" and, therefore, concluded that Alaska's sex offender registration statute "is nonpuni-

tive, and its retroactive application does not violate the [federal Constitution's] *Ex Post Facto* Clause." 538 U.S. at 97, 105–06, 123 S.Ct. at 1149, 1154, 155 L.Ed.2d at 179, 185.

Although the Supreme Court applied the two-part test and offered a more narrow protection in *Smith*, the next year, in *Khalifa*, this Court did not reference the Supreme Court's more limited two-part intent-effects test for addressing an alleged *ex post facto* violation. Rather, we reaffirmed our holding in *Frost*, that the "two critical elements" that "must be present" for a criminal or penal law to be an unconstitutional *ex post facto* law is that the law is retroactively applied to an offender, and that it disadvantages the offender. *Khalifa*, 382 Md. at 426, 855 A.2d at 1189–90. And, two years later, in *Demby*, we once again quoted *Weaver* and its statement that the "two critical elements" that needed to be proven to prohibit a penal or criminal law as an *ex post facto* law were that it was retroactively applied and that it disadvantaged the offender. 390 Md. at 609, 890 A.2d at 327.

With *Collins*, the Supreme Court limited the scope of the federal protection against *ex post facto* laws. We should not. Here, this Court is faced with a choice. We can follow *stare decisis* and continue to protect against laws that retroactively "disadvantage" an offender, which, as we maintained in *Anderson*, is "in manifest accord with the purpose of [the prohibition] to protect the individual rights of life and liberty against hostile retrospective legislation." 310 Md. at 224, 528 A.2d at 908 (quoting *Kring*, 107 U.S. at 229, 2 S.Ct. at 450, 27 L.Ed. at 509.) By doing so, we would, pursuant to Maryland law, continue to afford additional protections against *ex post facto* laws. Or, this Court can diverge from the standard we also acknowledged and confirmed in *Khalifa* and *Demby*, and instead follow the Supreme Court's analysis of the parallel federal protection applied in *Smith*, thereby narrowing the scope of Article 17's protections.[15]

As we have noted:

---

**15.** The United States Supreme Court decided *Smith v. Doe, supra,* in 2003. In 2004, we decided *State v. Raines*, 383 Md. 1, 857 A.2d 19

Our institutional devotion to stare decisis is not absolute, but we nonetheless remain deeply respectful of the doctrine. Adherence to stare decisis is our preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process. Only a fundamental change in factual or legal circumstances will justify departing from this principle.

*Houghton v. Forrest,* 412 Md. 578, 586–87, 989 A.2d 223, 228 (2010) (citations and quotations omitted). The State has failed to persuade us that we should overrule *Anderson* and its progeny, and limit the protections provided by Article 17 to only those provided by the federal Constitution.[16] Rather,

---

(2004). The dissenting opinion states that in *State v. Raines,* we "appl[ied] the intent-effects test of *Smith v. Doe* [to] conclud[e] that Maryland's DNA Collection Act is not an *ex post facto* law[.]" *See Doe v. Dep't of Public Safety and Corr. Serv.,* 430 Md. 535, 585, 62 A.3d 123, 153 (2013). To be clear, however, the initial opinion in *Raines,* following the standard set forth in *Smith,* is an opinion of only two judges of this Court. There were also two concurring opinions in *Raines,* however, those judges concurred only in the judgment and did not concur in the initial opinion. Moreover, when two members of this Court followed the *Smith* standard in *Raines,* they addressed the Article 17 protection together with the federal *ex post facto* protection. 383 Md. at 26, 857 A.2d at 34. In the present case, we address Article 17's prohibition against *ex post facto* laws independently of the federal prohibition. In doing so, we note that we have never abandoned the analysis applied in *Anderson* and *Gluckstern,* that Article 17's prohibition "extends broadly to any law passed after the commission of an offense which ... in relation to that offense, *or its consequences,* alters the situation of a party to his [or her] disadvantage[.]" *Anderson,* 310 Md. at 224, 528 A.2d at 908 (emphasis in original) (citations omitted).

**16.** Applying this Court's long-standing approach rather than following the United States Supreme Court's approach to the federal Constitution's prohibition against *ex post facto* laws, recognizes that Article 17, previously codified as Article 15, is an independent protection provided by the Maryland Constitution; an independent provision for over 230 years. *See* Dan Friedman, *The History, Development, and Interpretation of the Maryland Declaration of Rights,* 71 Temp. L.Rev. 637, 656 (1998) (noting that the protection against *ex post facto* laws has been in the Maryland Declaration of Rights since 1776); 1 Bernard Schwartz, *the Bill of Rights: A Documentary History,* at 281 (N.Y.1971) (same). To ensure the independent protection intended by Article 17, we elect not

with today's holding we reaffirm that Article 17 prohibits, under the *ex post facto* prohibition, "any law passed after the commission of an offense which ... in relation to that offense, *or its consequences*, alters the situation of a party to his [or her] disadvantage." *Gluckstern*, 319 Md. at 664, 574 A.2d at 913 (quoting *Anderson*, 310 Md. at 224, 528 A.2d at 908) (further quotations omitted).

**B.   Requiring Petitioner to register violates Article 17 of the Maryland Declaration of Rights.**

In the present case, the Maryland sex offender registration statute is applied retroactively to Petitioner.   Only the retro- active application of laws will implicate Article 17's protec- tions. *See Demby*, 390 Md. at 593 n. 10, 890 A.2d at 318 n. 10 (emphasis and quotation omitted) ("To prevail in an *ex post facto* claim, [claimants] must first show that the law that they are challenging applies retroactively to conduct that was com- pleted before the enactment of the law in question....").   As noted above, Petitioner's duty to register is imposed as a result of his conviction for a sex offense committed during the 1983–84 school year.   The Maryland sex offender registration statute was passed in 1995.   And, Petitioner was not required to register until sex offender registration was retroactively applied to him in 2009.

As we have determined that the sex offender registration statute has been applied retroactively to Petitioner, we next conclude that imposing registration upon Petitioner changes the consequences of Petitioner's crime to his disadvantage.

Article 17's prohibition is not implicated in purely civil matters. *See Spielman v. State*, 298 Md. 602, 609, 471 A.2d 730, 734 (1984) (quoting *Braverman v. Bar Ass'n of Baltimore*, 209 Md. 328, 348, 121 A.2d 473, 483 (1956)) (citations omitted) ("[I]n Maryland, 'the prohibition of *ex post facto* laws applies only to criminal cases.   There is no clause in the Maryland Constitution prohibiting retrospective laws in civil cases.' ").

to follow the United States Supreme Court or narrow the scope of the prohibition against *ex post facto* laws.

The State argues that the Maryland sex offender registration statute "has the non-punitive purpose of protecting children and the public from recidivist sex offenders." As we have previously noted, however, protection of the public is also a reason for incarcerating an offender. *Anderson*, 310 Md. at 228, 528 A.2d at 910. And, as we stated in *Anderson*, "the fact that a particular proceeding or matter is labeled 'civil' rather than 'criminal' does not necessarily remove it from the ambit of the ex post facto prohibition." 310 Md. at 225, 528 A.2d at 908 (citation omitted). We reaffirm that Article 17's "prohibition extends broadly to any law passed after the commission of an offense which . . . in relation to that offense, *or its consequences,* alters the situation of a party to his disadvantage." *Gluckstern,* 319 Md. at 664, 574 A.2d at 913 (emphasis in original) (quoting *Anderson,* 310 Md. at 224, 528 A.2d at 908) (further quotations omitted).

We begin by observing that Petitioner is required to register as a direct consequence of his commission of a sex offense and subsequent conviction for that offense. But for the fact that Petitioner committed a child sex crime and was subsequently convicted for that offense, he would not be labeled a Tier III sex offender and he would not be required to register. *See* C.P. §§ 11–701(q)(1)(ii); 11–704(a)(3) (2001, 2008 Repl. Vol., 2012 Cum.Supp.). Thus, imposing registration alters the consequences for a prior crime and implicates the *ex post facto* prohibition. *See Anderson,* 310 Md. at 224, 230, 528 A.2d at 908, 911 (citations omitted) (noting that commitment to a state mental institution "is a direct consequence of adjudications at [Mr. Anderson's] criminal trial that he was guilty of committing a crime but insane at the time of the crime[,]" and concluding that "[c]onsidering the nature of . . . confinement [in the mental hospital] under Maryland law, *and particularly the fact that it represents the disposition portion of an adverse judgment in a criminal case . . . we believe that the confinement does implicate the ex post facto prohibition."* (Emphasis added)).

In *Anderson,* we noted that "not every law passed after the commission of an offense, which changes the consequences of

that offense, is barred by the ex post facto prohibition." 310 Md. at 226, 528 A.2d at 909 (citation omitted). As the disadvantage standard has been applied in our cases, Article 17 prohibits the retroactive application of laws that have the effect on an offender that is the equivalent of imposing a new criminal sanction or punishment.[17]  In both *Gluckstern* and *Demby*, we concluded that the retroactive applications of changes in the law that likely had the practical effect of keeping persons incarcerated or confined by the State for a longer period of time violated the prohibitions against *ex post facto laws.*  *See Demby*, 390 Md. at 614–15, 616–18, 890 A.2d at 330–31, 331–33; *Gluckstern*, 319 Md. at 644, 669, 574 A.2d at 902–03, 915.  In the present case, the application of the sex offender registration statute to Petitioner in 2009 is the equivalent of imposing a new criminal sanction for Petitioner's prior commission of a sex crime in the 1980s.  Thus, the retroactive application of the sex offender registration statute to Petitioner violates Article 17.

First, requiring Petitioner to register has essentially the same effect on his life as placing him on probation.  It is well-settled in this State that probation is a form of a criminal sanction.  *See Corbin v. State*, 428 Md. 488, 502, 52 A.3d 946, 954 (2012) (quoting *United States v. Knights*, 534 U.S. 112, 119, 122 S.Ct. 587, 591, 151 L.Ed.2d 497, 505 (2001)) ("Probation, like incarceration, is a form of criminal sanction imposed by a court upon an offender after verdict, finding, or plea of

---

**17.**  This standard is very similar to the standard traditionally used by the Supreme Court, that "[e]very law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed" violates the federal prohibition on *ex post facto* laws. *Calder*, 3 Dall. at 390, 1 L.Ed. at 650 (emphasis omitted).  Under the Supreme Court's approach in *Smith*, however, when determining if the application of a law inflicts a greater punishment, the fact that "in its necessary operation, the regulatory scheme [imposed by the sex offender statute]: has been regarded in our history and traditions as a punishment[,]" 538 U.S. at 97, 123 S.Ct. at 1149, 155 L.Ed.2d at 180, is only one factor in the seven-factor *Mendoza* test.  Under Article 17, if the application of a law has an effect that is tantamount to imposing an additional criminal sanction, its retroactive application violates Article 17 of the Maryland Declaration of Rights.

guilty."). Because the sex offender registration statute has a highly similar effect on Petitioner's life as being on probation, applying the statute to Petitioner effectively imposes on him an additional criminal sanction.

Petitioner testified that under threat of "arrest[ ] and incarcerat[ion]" he was required to register in 2009. *See* C.P. § 11–704 (2001, 2008 Repl.Vol., 2009 Cum.Supp.); C.P. § 11–721 (2001, 2008 Repl.Vol.). Petitioner currently must report in person to law enforcement every three months, give notice to law enforcement of his address and any changes of address, and notify law enforcement before being away from his home for more than seven days. *See* C.P. §§ 11–705; 11–706, 11–707 (2001, 2008 Repl.Vol., 2012 Cum.Supp.). Furthermore, he must disclose to the State a significant amount of information, some of which is highly personal, including: his employment address; information about his conviction; his social security number; his email address and computer log-in names; information about vehicles he often uses, including those not owned by him; his finger prints and palm prints; all "identifying factors, including a physical description," and an updated digital image of himself. *See* C.P. §§ 11–706, 11–707 (2001, 2008 Repl.Vol., 2012 Cum.Supp.). Additionally, other than to vote, Petitioner is prohibited from entering onto real property that is used as a school or a family child care center licensed under Title 5, Subtitle 5 of the Family Law Article, without first obtaining permission. C.P. § 11–722 (2001, 2008 Repl. Vol., 2012 Cum.Supp.). If Petitioner fails to comply with these requirements, he faces terms of imprisonment, depending on the violation, of up to three or five years. *See* C.P. §§ 11–721, 11–722(d) (2001, 2008 Repl.Vol., 2012 Cum.Supp.).

These restrictions and obligations have the same practical effect as placing Petitioner on probation or parole.[18] *See Doe*

---

**18.** As we noted in *Patuxent v. Hancock,* 329 Md. 556, 620 A.2d 917 (1993), while probation is ordered by a judge before incarceration begins, and parole is granted while a party is incarcerated, both have the same consequence, that a criminal offender is allowed to spend a portion of his or her sentence released in the community if he or she adheres to prescribed conditions. 329 Md. at 574, 620 A.2d at 926

*v. State,* 189 P.3d 999, 1012 (Alaska 2008); *Wallace,* 905 N.E.2d at 380–81. As a result of Petitioner's conviction; he was required to register with the State, and he must now regularly report in person to the State and abide by conditions established by the State or he faces re-incarceration. This is the same circumstance a person faces when on probation or parole; as the result of a criminal conviction, he or she must report to the State and must abide by conditions and restrictions not imposed upon the ordinary citizen, or face incarceration. *See Bryant v. Social Services,* 387 Md. 30, 37, 874 A.2d 457, 461 (2005) (noting that as a condition of probation the petitioner was required to report to his probation officer); *Patuxent v. Hancock,* 329 Md. 556, 566 n. 8, 575, 620 A.2d 917, 922 n. 8, 926 (1993) (stating that as a condition of Mr. Hancock's parole he was required to "attend weekly supervision as directed," and that, in general, as conditions of parole, offenders face restrictions "not affecting the ordinary citizen or in which the ordinary citizen is entirely free to act[,]" such as "prohibiting associations, and regulating ... interstate travel ... and the frequenting of certain places"); *see also State v. Raines,* 383 Md. 1, 51, 857 A.2d 19, 49 (2004) (Wilner, J. concurring) ("[W]hile on probation or parole[,]" a person "may be required to submit to ... intrusive monitoring."); *Benedict v. State,* 377 Md. 1, 8, 831 A.2d 1060, 1064 (2003) (noting that when an offender is on probation, if he or she violates the probation, the court may revoke probation and order the offender returned to prison); *Frost,* 336 Md. at 139, 647 A.2d at 113 (citation omitted) ("parolees who violate the conditions of their release are subject to re-incarceration").

When Petitioner was sentenced in 2006 for his sex crime, the trial judge imposed a sentence of ten years incarceration, with all but four and one half years suspended, and three years supervised probation upon release from incarceration. Pursuant to the current Maryland sex offender registration

---

(citations omitted). As noted above, sex offender registration, which requires Petitioner to follow prescribed conditions or face incarceration, is similar to both probation and parole.

statute, however, Petitioner must register for life. *See* C.P. § 11–707(a)(4) (2001, 2008 Repl.Vol., 2012 Cum.Supp.). There is no evidence in the record that Petitioner has been convicted of any crimes since 1984. When the State imposed registration upon him in 2009, however, it had an effect that was the equivalent of placing Petitioner on probation for life as a result of his sex offense. Thus, although the statute may be labeled "civil" · or "regulatory," it effectively imposes upon Petitioner an additional criminal sanction for a crime committed in the 1980s.

Moreover, the dissemination of Petitioner's information pursuant to the sex offender registration statute, is tantamount to the historical punishment of shaming. When the Alaska and Indiana Supreme Courts concluded that the retroactive application of their respective sex offender registration statutes violated their state constitutions' prohibition against *ex post facto* laws, the two courts both determined that public dissemination of information about registrants "at least resembles the punishment of shaming[.]" *See Doe,* 189 P.3d at 1012 (footnotes omitted); *Wallace,* 905 N.E.2d at 380 (citations and quotations omitted). We conclude that the Maryland sex offender registration statute's dissemination provisions have the same effect.

In *Young v. State,* 370 Md. 686, 806 A.2d 233 (2002), we examined an earlier version of the Maryland sex offender registration statute in the context of due process rights.[19]

---

**19.** The State's argument that we should conclude that the sex offender registration statute is a civil law and thus its retroactive application does not offend the prohibitions against *ex post facto* laws relies on our decision in *Young v. State,* 370 Md. 686, 806 A.2d 233 (2002), that Maryland's sex offender registration statute did "not constitute punishment in the constitutional sense, as defined by the United States Supreme Court. . . ." 370 Md. at 690, 806 A.2d at 235. In that case, however, we addressed whether the statute violated the petitioner's due process rights "in light of [the United States Supreme Court case] *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000)." 370 Md. at 690, 806 A.2d at 235. Because in the present case we address the Petitioner's assertion in light of Maryland's prohibition against *ex post facto* laws provided by Article 17, our decision in *Young,* and its conclusion that the statute was not a "punishment . . . as

Notwithstanding our conclusion in *Young* that the sex offender registration statute, as a whole, was not so punitive in effect to exceed its nonpunitive purpose, the majority, in that case, conceded that the dissemination of a registrant's information, including some private information, imposes "affirmative disabilities" on registrants because the dissemination has the effect of "label[ing a registrant] as a sexual offender within the community [which] can be highly stigmatizing and can carry the potential for social ostracism." 370 Md. at 713, 806 A.2d at 249. The majority further expressed concerns in *Young* that "the newly initiated Internet notification [that was beginning to be used in Maryland would] threaten[ ] widespread disclosure of highly personal data and may implicate social ostracism, loss of employment opportunities, and possibly verbal and physical harassment." 370 Md. at 718 n. 13, 806 A.2d at 252 n. 13. Examining the sex offender registration statute now and in the context of the *ex post facto* prohibition, we conclude, as the Court in *Young* predicted, that the dissemination of information about registrants imposes many negative consequences. The result is that the dissemination of information about registrants, like Petitioner, is the equivalent of shaming them, and is, therefore, punitive for *ex post facto* purposes.[20]

---

defined by the United States Supreme Court," is not directly applicable to the present case where we examine the law through a different lens.

**20.** The State relies on the *Smith* Court's conclusion that disabilities faced by registrants as a result of the public dissemination of their information is actually a result of publically available conviction records, not the dissemination of registrants' information. *See Smith,* 538 U.S. at 98–99, 123 S.Ct. at 1150, 155 L.Ed.2d at 181. We disagree. First, there is a significant difference between the information that is available to someone who is specifically searching for information about a particular person and a list of all registrants available to any person with access to the Internet. *See Doe v. State,* 189 P.3d 999, 1011 (Alaska 2008). The increased accessibility of information about an offender to the public is the intended effect of creating a publically disseminated registry. *See Smith,* 538 U.S. at 99, 123 S.Ct. at 1150, 155 L.Ed.2d at 181 (noting that "[w]idespread public access [to information about offenders] is necessary for the efficacy of the [sex offender registration] scheme"). Furthermore, while many of the disabilities, such as being denied a home or a job based on a background check, are

Justice Ginsburg noted in her dissent in *Smith*, the "public notification [requirement], which permits placement of the registrant's face on a webpage under the label 'Registered Sex Offender,' calls to mind shaming punishments once used to mark an offender as someone to be shunned." 538 U.S. at 116, 123 S.Ct. at 1159, 155 L.Ed.2d at 191–92 (Ginsburg, J., dissenting) (citations omitted). On the Maryland Sex Offender Registry Website, a color picture of a registrant is included on the Registry and appears when the icon over the registrant's home is selected on the searchable map. *See* Md. Dep't of Public Safety and Corr. Servs., *Sex Offender Registry: SOR Search*, http://www.dpscs.state.md.us/sorSearch/ (last visited Feb. 13, 2013); Md. Dep't of Public Safety and Corr. Servs., *Sex Offender Registry Mapping*, http://sorm.towson.edu (last visited Feb. 13, 2013).

Amicus highlighted in its brief to this Court the harms caused by dissemination that render it the equivalent of the punishment of shaming. In one of the affidavits attached to Amicus's brief, the affiant attests that he has had significant problems finding housing after his lease was terminated early and the property management company indicated that "being

---

as likely to result from the registrant's publically available conviction, some of the disabilities, such as registrants and their families being subject to protests and harassment, have been shown to result from sex offender registration and dissemination. *See Doe v. Pataki*, 120 F.3d 1263, 1279 (2d Cir.1997) (noting that the parties in that case stipulated to "numerous instances in which sex offenders have suffered harm in the aftermath of notification—ranging from public shunning, picketing, press vigils, ostracism, loss of employment, and eviction, to threats of violence, physical attacks, and arson."); Richard Klein, *An Analysis of Thirty–Five Years of Rape Reform: A Frustrating Search For Fundamental Fairness*, 41 Akron L.Rev. 981, 1039 (2008) ("The community notification and public dissemination provisions, which publicize where an offender lives and information about his crime, have led to widespread labeling, ostracizing, and attacks on the ex-offender."); Wayne A. Logan, *Criminal Law: Liberty Interests in the Preventative State: Procedural Due Process and Sex Offender Community Notification Laws*, 89 J.Crim. L. & Criminology 1167, 1176–77 n.45 (1999) (noting that as a result of dissemination about sex offenders, among other things, members of communities have staged rallies to protest the offender's presence, and in one instance a man had a brick thrown through his car window).

a registered sex offender was a 'non-curable violation of the lease agreement[.]' " In one of our past cases, as a result of registration, one registrant was evicted from his home and rendered homeless because of the notice published to the community. *See Twine v. State*, 395 Md. 539, 544–45, 910 A.2d 1132, 1135 (2006). While concluding that the dissemination of information pursuant to the Alaskan sex offender registration statute, in *Smith*, was not akin to shaming, the United States Supreme Court stated that one of the hallmarks of shaming was that it often included the expulsion of the offender from the community. 538 U.S. at 98, 123 S.Ct. at 1150, 155 L.Ed.2d at 180 (citations omitted). For those registrants removed from their rental homes or rendered homeless by the dissemination of information, the effect, in our view, is quite similar to expulsion from the community.

Additionally, other harms caused by dissemination render its effects tantamount to the traditional punishment of shaming. A study by the United States Department of Justice indicated that 77% of registrants in another state surveyed reported "threats/harassment[.]" Richard G. Zevitz & Mary Ann Farkas, United States Department of Justice, National Institute of Justice, *Sex Offender Community Notification: Assessing the Impact in Wisconsin*, at 10 (Dec.2000), *available at* https://www.ncjrs.gov/pdffiles1/nij/179992.pdf. And, the affidavit provided by the Executive Director of Families Advocating Intelligent Registries, a non-profit Maryland organization, indicates that the Director has received reports of children of registrants being bullied because of their parent's status on the Registry. Another affiant stated that through her job and membership in family support groups, she is "aware . . . that even those employers that do hire felons often have a policy that automatically excludes persons on the sex offender registry in order to avoid publication of the employer's name/address on the registry and the accompanying negative publicity."

Finally, when analyzing whether the retroactive application of its own sex offender registration statute violated the *ex post facto* prohibition in the Alaskan Constitution, the Alaska Su-

preme Court noted that there have been "published reports that offenders are sometimes subjected to protests and group actions designed to force them out of their jobs and homes," such that "the practical effect of such unrestricted dissemination could make it impossible for the offender to find housing or employment," and in other states "there have been reports of incidents of suicide by and vigilantism against offenders on state registries." *Doe v. State,* 189 P.3d at 1010–11 (footnotes and quotations omitted).

In the present case, the statute places a registrant's information, including his or her address, on the Internet for anyone with Internet access to see, and allows members of the public, who live in the county where a registrant will live, work, or attend school, by request, to receive email notifications of the registrant's release from incarceration and "the registration information of the [registrant]." *See* C.P. § 11–717 (2001, 2008 Repl.Vol., 2012 Cum.Supp.). Examining dissemination in the context of whether it violates the prohibition against *ex post facto* laws, we, therefore, conclude that the dissemination provisions of the Maryland sex offender registration statute have an effect upon Petitioner that is tantamount to shaming.

When Petitioner committed his sex crime during the 1983–84 school year he did not face registration under the statute as a consequence for his crime. Registration was imposed, over twenty years later in 2009, under the sex offender registration statute as a direct consequence of Petitioner's commission and conviction for his sex crime. The application of the statute has essentially the same effect upon Petitioner's life as placing him on probation and imposing the punishment of shaming for life, and is, thus, tantamount to imposing an additional sanction for Petitioner's crime. Therefore, we conclude that the imposition of the registration requirement upon Petitioner, as the result of amendments passed 25 years after Petitioner's crime, to a statute passed over a decade after Petitioner's commission of a crime is in violation of the *ex post facto* prohibition contained in Article 17 of the Maryland Declaration of Rights.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR WASHINGTON COUNTY AND TO DIRECT THE CIRCUIT COURT TO ENTER A DECLARATORY JUDGMENT CONSISTENT WITH THIS OPINION. RESPONDENT TO PAY THE COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS.

Concurring Opinion by HARRELL, J.

I write separately because, although I would give John Doe relief, I would not grant relief on the same basis as the Plurality opinion. Instead, I would direct specific performance of Mr. Doe's guilty plea, not to include requirement of registration as a child sexual offender.

The Plurality opinion posits its granting of relief solely on its *ex post facto* analysis under Article 17 of the Maryland Declaration of Rights. I would not do so. The reasoning of the Plurality opinion is faulty and, therefore, so is its conclusion. To my mind, a correct reading of Article 17 and the most relevant cases leads to the conclusion that Doe is not entitled to the relief he seeks on the constitutional arguments he makes.

Since 2009, several amendments to the Maryland Sex Offender Registration Act have been adopted, including, but not limited to: (1) adding juvenile sex offenders to the list of those who must register; (2) requiring registration statements to include a list of aliases, electronic email addresses, computer screen names, or any name by which the registrant had been legally known; (3) requiring tier III offenders (such as Doe) to register in person every three months for life; (4) requiring that registrants provide three days notice after changing addresses; (5) ordering registrants to notify law enforcement, prior to the relocation, when the registrant obtains a temporary residence or changes the location where the registrant resides or "habitually lives" for more than 5 days; (6) requir-

ing homeless registrants to register in person with the local law enforcement in each county where the registrant habitually lives; (7) publicize registration information on the Internet; and (8) granting the Department of Public Safety and Correctional Services and law enforcement the discretion to provide notice of a registration statement or a registrant's change of address to whomever they deem necessary so as to protect the public from the registrant. *See* Md.Code (2008 Repl.Vol., 2010 Supp.), Crim. Proc. Art., §§ 11–701, 11–705, 11–706, 11–717, 11–718.

*Smith v. Doe*, 538 U.S. 84, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003), and *Young v. State*, 370 Md. 686, 806 A.2d 233 (2002), are the two leading cases addressing *ex post facto* challenges to sex offender registration statutes.[1]  Both cases employ the "intent-effects" test to determine whether a statute violates *ex post facto* clauses:  first, the court must consider the legislative intent of the statute;  second, even if the statute's stated purpose is non-punitive, the court must assess whether its effect overrides the legislative purpose to render the statute punitive.[2]  *Smith*, 538 US. at 92, 123 S.Ct. at 1146–47, 155 L.Ed.2d at 176 (2003).  To assess the effects of a statute, a

---

**1.** In *Smith,* the Supreme Court considered the Alaska sex offender registration statute, which: (1) required registration with state or local law enforcement authorities; (2) publicized registration and non-confidential information on the Internet; and (3) applied retroactively to offenders who had been convicted before the law's enactment *Smith,* 538 U.S. 84, 90–91, 123 S.Ct. 1140, 1145–46, 155 L.Ed.2d 164, 174–76 (2003). In *Young,* the Court of Appeals considered whether the 2002 sex offender registration statute, then codified as Maryland Code Article 27, § 792 (now § 11–701 of the Criminal Procedure Article) was an additional penalty that required a jury trial to prove the actual conditions precedent to registration. *Young v. Maryland,* 370 Md. 686, 690, 806 A.2d 233, 235 (2002).

**2.** In his dissent, Justice Stevens advocated a different analytical approach to an *ex post facto* challenge: looking at the Act's application and effect, he distinguished other cases in which the *ex post facto* challenge was rejected on the ground that, unlike other cases, "a criminal conviction under these [analogous] statutes provides both a *sufficient* and a *necessary* condition for the sanction." *Smith,* 538 U.S. at 112, 123 S.Ct. at 1157–5, 155 L.Ed.2d at 189 (Stevens, J., dissenting) (emphasis in original).

court must consider several factors, derived from *Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963).[3] *Smith* and *Young* held that the statutes at issue were intended as civil remedies because the primary government interest was to protect the public from sex offenders. *Smith*, 538 U.S. at 93–94, 123 S.Ct. at 1147, 155 L.Ed.2d at 177; *Young*, 370 Md. at 712, 806 A.2d 233, 248.

Although the Maryland registration statute does not state expressly its legislative purpose, the Court of Appeals found in *Young* that the statute's overall design and plain language indicate that it was intended as a "regulatory requirement" aimed to protect the public rather than to punish or stigmatize offenders. *Young*, 370 Md. at 712, 806 A.2d at 248. This was true, the Court noted, even if the 2002 statute was codified (as is the current registration statute) in the Maryland Criminal Procedure Article, or even if registration is triggered by a criminal conviction. *Id.* at 712, 714, 806 A.2d at 248–49. The Supreme Court in *Smith* also came to the same conclusion, even if Alaska—similar to Maryland—required that defendants be notified about the statute's requirements. *Smith*, 538 U.S. at 95–96, 123 S.Ct. at 1148–49, 155 L.Ed.2d at 178–79; *see also* Md. Rule 4–242 (2012).

Nevertheless, significant revisions to the Maryland registration statute have occurred since the *Young* court reviewed the statute in 2002. The Supreme Court in *Smith* and the Court of Appeals in *Young* concluded that registration statutes traditionally have "not been regarded as punishment," 370 Md. at 714, 806 A.2d at 250, particularly if the State does not make "the publicity and the resulting stigma an integral part of the

---

**3.** The relevant factors include, but the analysis is not limited to: (1) whether the sanction involves an affirmative disability or restraint; (2) whether it has been regarded historically as punishment; (3) whether its operation will promote the traditional aims of punishment: retribution and deterrence; (4) whether the behavior to which it applies is a crime already; (5) whether the law has a scienter requirement; (6) whether it lacks an alternative purpose to which it may be connected rationally; and (7) if such an alternative does exist, whether the statute appears excessive in relation to the alternative. *Mendoza–Martinez*, 372 U.S. at 168–69, 83 S.Ct. at 567–68, 9 L.Ed.2d at 660–62.

objective of the regulatory scheme" but rather to protect the public. *Smith,* 538 U.S. at 98–99, 123 S.Ct. at 1150, 155 L.Ed.2d at 180–81. Disseminating registrants' basic registry information, without further government involvement, is a reasonable civil deterrent remedy. *Young,* 370 Md. at 714–15, 806 A.2d at 250; *see also Smith,* 538 U.S. at 102–103, 123 S.Ct. at 1152, 155 L.Ed.2d at 183. Yet, the Supreme Court noted that if a state provides the public "with means to shame the offender by, say, posting comments underneath his record" on the registry web site, dissemination of registry information may resemble the public shaming punishments of the colonial period. *Smith,* 538 U.S. at 99, 123 S.Ct. at 1150–51, 155 L.Ed.2d at 181. Currently, the Maryland registry web site allows any person to post comments, that are available for the public to view, below a registrant's profile.

A second factor to consider is whether the registration statute imposes impermissibly an affirmative disability or restraint on registrants. A registration statute involves an affirmative disability or restraint when either result would occur, apart from consequences common to registering as a sex offender, such as inability to find work or housing due to employers' or landlords' routine background and criminal checks, or seeking permission before changing jobs or residences. *Id.* at 100, 123 S.Ct. at 1151, 155 L.Ed.2d at 181–82. In-person registration requirements, however, may involve punitive restraints. *Id.* Currently, Maryland's registration statute, as noted above, requires in-person registration for tier III offenders, such as Doe, every three months for life. *See* Md.Code, Crim. Proc. Art., § 11–707(a).

The *Young* court recognized that, although basic registrant-identifying information was "not unreasonably burdensome," the community notification provisions of the statute imposed "highly stigmatizing" labels. 370 Md. at 713, 806 A.2d at 249. These labels carried "the potential for social ostracism" because the statute allowed for dissemination of non-public and sensitive information about registrants, such as treatment received for personality disorder or a mental abnormality. *Id.* This risk is present potentially with Maryland's statute, which

requires registrants to inform the State on every change of location, including any place in which a registrant "habitually lives" or stays for more than five days, and also allows the Department or law enforcement to share the information with anyone when it is necessary to do so to protect the public. *See* Md.Code, Crim. Proc. Art. §§ 11–705(i), 11–718(a).

Furthermore, both *Smith* and *Young* relied on the state legislatures' conclusions that sex offenders pose a substantial risk of recidivism. *See Smith,* 538 U.S. at 102, 123 S.Ct. at 1152, 155 L.Ed.2d at 183; *Young,* 370 Md. at 715, 806 A.2d at 250. A state can use reasonable means to legislate with regard to convicted sex offenders as a class; thus, requiring an "individual determination of their dangerousness" does not convert the statute into a punishment under the *ex post facto* clause. *Smith,* 538 U.S. at 103–04, 123 S.Ct. at 1153, 155 L.Ed.2d at 183–84. As long as a registration statute is tailored narrowly to prevent repetition of sex offenses and requires only qualifying sex offenders to register, as the Court found § 792 did in *Young,* it is not excessive in its deterrent purpose. *See Young,* 370 Md. at 715, 806 A.2d at 250.

New research since 2002, however, presents a different policy perspective to *Young's* holding. Applying such a broad-reaching statute like Maryland's to any qualifying sex offender without particularized determinations of recidivism may undermine the law's intent to prevent the repetition of sex offenses Indeed, recent research reports that broad-reaching sex offender registration and notification laws do not reduce recidivism by sex offenders. See, e.g., Catherine L. Carpenter, *Legislative Epidemics: A Cautionary Tale of Criminal Laws that Have Swept the Country,* 58 Buff. L.Rev. 1, 58–59 (2010) (noting that, "[d]espite the persistent statements that expansive sex offender registration laws are essential tools to protect the community," the efficacy of such laws is in doubt); *see also* Human Rights Watch, *No Easy Answers: Sex Offender Laws in the U.S.* 21–33 (Sept.2007). Several states have used such findings to hold that their sex offender registration statutes constitute retroactive punishment in violation

of state or federal prohibitions of *ex post facto* laws, primarily based on the lack of any determination of future dangerousness before or after an offender is required to register. *See, e.g., State v. Williams,* 129 Ohio St.3d 344, 952 N.E.2d 1108, 1113 (2011); *State v. Letalien,* 985 A.2d 4 (Me.2009); *Wallace v. State,* 905 N.E.2d 371 (Ind.2009); *Commonwealth v. Baker,* 295 S.W.3d 437 (Ky.2009); *Doe v. State,* 189 P.3d 999, 1019 (Alaska 2008).

The Court in *Young* noted that the consequences of the 2002 Maryland registration statute's widespread community notification—namely, stigmatization, social ostracism, loss of employment, and harassment—implicate liberty and privacy interests inherent to due process. 370 Md. at 713, 806 A.2d at 249. To raise a successful due process challenge involving damage to reputation, the "stigma-plus test" requires that, in addition to harming the plaintiff's reputation, the state's conduct must have harmed the plaintiff in an additional way. *Doe v. Dep't of Pub. Safety & Corr. Servs.,* 185 Md.App. 625, 644, 971 A.2d 975, 986 (2009). The "plus" factor is met either by a violation of a "fundamental right" guaranteed by the U.S. Constitution or "the denial of a state-created property or liberty interest such that the Fourteenth Amendment's Due Process Clause is violated." *Id.* at 639, 643–44, 971 A.2d at 983–84, 986–87 (quoting *Cooper v. Dupnik,* 924 F.2d 1520, 1532 n. 22 (9th Cir.1989)). Conversely, procedural due process guarantees an opportunity for a hearing to establish a material fact when a claimant has suffered a deprivation of life, liberty, or property. *Conn. Dep't of Pub. Safety v. Doe,* 538 U.S. 1, 4, 123 S.Ct. 1160, 1162–63, 155 L.Ed.2d 98, 102 (2003).

Doe contends that the statutory requirements harmed his reputation and his "fundamental" rights to property, privacy, and employment, and that he has a procedural due process right to an individualized determination of his imputed dangerousness. A correct interpretation of relevant precedent, however, does not support Doe's arguments. As to Doe's

substantive due process claim,[4] while there is no fundamental right to employment, the Court of Special Appeals has held that the Maryland internet database sex offender registry does not violate the right to privacy because a registrant's photograph and criminal record are " 'already fully available to the public and [are] not constitutionally protected.' " *Doe,* 185 Md.App. at 645–47, 971 A.2d at 987–88 (citing *Russell v. Gregoire,* 124 F.3d 1079, 1093–94 (9th Cir.1997)). Moreover, apart from his own testimony, Doe presented no evidence in the Circuit Court or in his brief to support his claims that he has been unable to find sustainable work or that he is suffering financially.

Second, the U.S. Supreme Court's decision in *Connecticut Department of Public Safety v. Doe* forecloses Doe's argument that he is entitled to a hearing before being required to register. In *Connecticut Department,* the Court held that procedural due process did not entitle a sex offender to a hearing to determine dangerousness before being required to register because the offender's present dangerousness was irrelevant to the statute's registration requirement. 538 U.S. at 4, 123 S.Ct. at 1162–63, 155 L.Ed.2d at 102. The Court relied on the finding that conviction of a qualifying offense is the sole factor in determining whether an individual must register as a sex offender—individual dangerousness is irrelevant. *See id.* at 5, 123 S.Ct. at 1163, 155 L.Ed.2d at 103–04. The Court of Special Appeals agreed with the Supreme Court's reasoning in addressing the same issue under Maryland's sex offender registration statute in *Doe v. Department of Public Safety & Correctional Services,* 185 Md.App. at 634–36, 971 A.2d at 980–82. Even if Doe was deprived of a protected interest, he does not have a due process right to a hearing because individual dangerousness is irrelevant to the registration requirement.

---

**4.** In an unpublished opinion, the Court of Special Appeals declined to address Doe's substantive due process claim because he waived it by failing to raise the claim in his initial brief.

All is not lost, however. I am persuaded by Doe's argument that, on this record, he is entitled to specific performance of the plea agreement in this case. Doe and the State contend that the plea agreement's silence as to sex offender registration supports their arguments. Determining the meaning of a sentencing term in a plea agreement requires strict adherence to the "four corners" of the plea agreement as established in the Maryland Rule 4–243 plea proceeding and to "due process concerns for fairness and adequacy of procedural safeguards." *Cuffley v. State*, 416 Md. 568, 580–581, 7 A.3d 557, 563–65 (2010) (quoting *Solorzano*, 397 Md. 661, 668, 919 A.2d 652, 656 (2007)).[5] Extrinsic evidence is irrelevant to identify the agreement's terms; rather, the terms are limited to what a reasonable lay person in the defendant's position would have understood to be the terms of the plea agreement. *Id.* at 582–83, 7 A.3d at 563–65. Any ambiguities in the record concerning the agreement's terms are resolved in the defendant's favor. *Id.* at 583, 7 A.3d at 566.

In the present case, the Maryland Rule 4–243 hearing record from 2006 does not indicate that sex offender registration was a term of Doe's plea agreement. The plea agreement was limited to a five-year term, and it was only at the sentencing hearing that the judge ordered Doe to register as a sex offender. Assuming that a registration term would be included in an agreement at Doe's 2006 plea hearing, a reasonable person in Doe's position likely would understand that registering as a sex offender was not a part of the agreement. *See id.* at 581–83, 7 A.3d at 564–66. The prosecutor's testimony at the hearing in 2010 on the present declaratory judgment relief, as to what she and Doe's attorneys discussed before the plea hearing, is irrelevant. *See id.*

Furthermore, the policy arguments of good faith and efficiency of plea negotiations support using the *Cuffley* approach

---

**5.** In *Cuffley*, the Court considered the legality of a defendant's sentence that exceeded the incarceration guidelines, but suspended all but part of the sentence that fell within the guidelines, as agreed to in the defendant's plea agreement. 416 Md. at 577, 7 A.3d at 562.

in this case. One primary concern to the majority in *Cuffley* was the potential risk that defendants would not understand the nature of the agreement before pleading guilty. 416 Md. at 583, 7 A.3d at 566. This risk may be present when plea terms to which a defendant agreed change retrospectively. Second, permitting retrospective application of the Maryland Act may discourage defendants to plead guilty, since defendants must have some reasonable assurance that the benefit promised in their plea agreements will not be withdrawn in the future, as the Amicus Brief argues here. This is significant in the state criminal justice system, where ninety-four percent of state convictions result from guilty pleas. *See Missouri v. Frye,* —— U.S. ——, ——, 132 S.Ct. 1399, 1407, 182 L.Ed.2d 379, 389 (2012); *see also State v. Brockman,* 277 Md. 687, 693, 357 A.2d 376, 380–81 (1976).

Accordingly, I would reverse the judgment of the Court of Special Appeals, remand to that court with directions to reverse the judgment of the Circuit Court for Washington County and direct the Circuit Court to enter a declaratory judgment consistent with the views expressed here, including any further proceedings required to enforce specifically Doe's plea agreement, which does not include him having to register as a sex offender as the result of the crime he committed in 1984.

Concurring Opinion by McDONALD, J. which ADKINS, J., joins.

I concur in the judgment of the Court. However, I would not rest our decision on the new interpretation of Article 17 offered by the plurality opinion.[1] In my view, neither the

---

1. This Court has repeatedly stated that Article 17 has "the same meaning" as the parallel federal constitutional provision. *E.g., DPSCS v, Demby,* 390 Md. 580, 609, 890 A.2d 310 (2006). The plurality opinion suggests that the Supreme Court deviated from the common understanding of the prohibition against *ex post facto* laws in 1990 when it decided *Collins v. Youngblood,* 497 U.S. 37, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990). Plurality Op. at p. 553, 62 A.3d at 133–34. However, this Court has relied on *Collins* on several occasions when analyzing

language nor the history of that provision, taken as a whole, offers a principled reason for differentiating its prohibition against *ex post facto* laws from the parallel prohibition in the federal Constitution. Rather, the cumulative effect of 2009 and 2010 amendments of the State's sex offender registration law took that law across the line from civil regulation to an element of the punishment of offenders. *See generally* Catherine L. Carpenter & Amy E. Beverlin, *The Evolution of Unconstitutionality in Sex Offender Registration Laws,* 63 Hastings L.J. 1071, 1107–22 (2012); Corey Rayburn Yung, *One of these Laws is Not Like the Others: Why the Federal Sex Offender Registration and Notification Act Raises New Constitutional Questions,* 46 Harv. J. Leg is. 369, 386–400 (2009). It was certainly within the General Assembly's purview to make the registration law more onerous for offenders. In my view, however, in light of both Article 17 of the Declaration of Rights and Article I, § 10 of the federal Constitution, like other new laws affecting punishment for offenses, those amendments may not be applied retroactively.

Judge ADKINS joins in this opinion.

Dissenting Opinion by BARBERA, J.

Respectfully, I dissent. For reasons I shall explain, I do not believe Petitioner is entitled to the relief he seeks under the federal and state law grounds he asserts. I agree with Judge McDonald that the Plurality's interpretation of Maryland's *ex post facto* prohibition is unsupported by the language or history of Article 17 of the Maryland Declaration of Rights.[1]

---

whether application of a particular State law violated that prohibition. *E.g., Booth v. State,* 327 Md. 142, 168–76, 608 A.2d 162 (1992); *Evans v. State,* 382 Md. 248, 280–85, 855 A.2d 291 (2004). The past decisions of this Court led the author of a treatise on the Maryland Constitution to conclude that "[t]he Court of Appeals of Maryland considers the two provisions to have precisely the same meaning." D. Friedman, The Maryland State Constitution (2006) at 25–26.

1. Although six judges would reverse the judgment of the Court of Special Appeals, they do not agree on the rationale for that outcome. With regard to the *ex post facto* claim in particular, five judges—Chief

Nor, for that matter, do I see a principled reason to depart in this case from the approach this Court has consistently taken in reading Article 17 *in pari materia* with the federal *Ex Post Facto* Clause. Unlike Judge McDonald, I agree with Judge Harrell that the 2009 and 2010 amendments to Maryland's sex offender registration law survive under federal *ex post facto* law and, because I read the *ex post facto* clause of Article 17 *in pari materia* with the federal *Ex Post Facto* Clause, the 2009 and 2010 amendments to the law do not violate Article 17. I write separately, though, to explain how I arrive at that result. I also agree with Judge Harrell that Maryland's current sex offender registration law does not offend due process. Finally, I disagree with Judge Harrell's application of *Cuffley v. State*, 416 Md. 568, 7 A.3d 557 (2010), to this case and his ultimate conclusion that, because Petitioner's plea agreement was silent as to sex offender registration, he cannot be compelled to comply with the law.

I.

This Court has traditionally construed Article 17 *in pari materia* with the federal *Ex Post Facto* Clause and has declared repeatedly that the two clauses have the same meaning. *See, e.g., Sec'y, Dep't of Public Safety and Corr. Servs. v. Demby*, 390 Md. 580, 608, 890 A.2d 310 (2006) ("We have held that the *ex post facto* clause in the Maryland Declaration of Rights has the same meaning as the federal clause."); *State v. Raines*, 383 Md. 1, 26, 857 A.2d 19 (2004) (same); *Khalifa v. State*, 382 Md. 400, 425, 855 A.2d 1175 (2004) ("The *Ex Post Facto* Clauses of the United States Constitution and Maryland Declaration of Rights have been viewed generally to have the 'same meaning' and are thus to be construed *in pari materia*."); *Evans v. State*, 382 Md. 248, 280 n. 13, 855 A.2d 291

---

Judge Bell and Judges Greene, Adkins, McDonald and Eldridge (retired, specially assigned)—agree that the current Maryland sex offender registration law is an *ex post facto* law. Yet only three—Chief Judge Bell, Judge Greene (author of the Plurality opinion) and Judge Eldridge—rest the decision on Article 17 and, in doing so, construe that Article more broadly than the federal *Ex Post Facto* Clause.

(2004) (same); *Frost v. State*, 336 Md. 125, 136, 647 A.2d 106 (1994) (same); *Anderson v. Dep't of Health and Mental Hygiene*, 310 Md. 217, 223, 528 A.2d 904 (1987) (stating that the Maryland *ex post facto* clause "has been viewed as having the same meaning as the federal prohibition"). I would not depart from our well-established practice of examining the Maryland and federal *ex post facto* prohibitions under the same rubric, using federal jurisprudence as persuasive authority. *See, e.g., Tichnell v. State*, 287 Md. 695, 736, 415 A.2d 830 (1980) ("Article 17 ... parallels the federal clause and the Supreme Court's interpretation of the federal *ex post facto* clause is persuasive authority." (citations omitted)). As we have done previously, we should look to the principles set forth in the Supreme Court's *ex post facto* cases for guidance in determining whether the sex offender registration provisions of current Maryland law violate the federal *ex post facto* prohibition and, thereby, also Article 17. Faithful application of those principles leads me to conclude that the General Assembly did not enact an *ex post facto* law by making retrospective the current sex offender registration scheme.

The *Ex Post Facto* Clause of the federal Constitution, in relevant part, forbids "[e]very law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed." *Stogner v. California*, 539 U.S. 607, 612, 123 S.Ct. 2446, 156 L.Ed.2d 544 (2003) (quoting *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 390, 1 L.Ed. 648 (1798)); *see Evans*, 382 Md. at 281, 855 A.2d 291 (quoting same); *see also Collins v. Youngblood*, 497 U.S. 37, 43, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990) ("Legislatures may not retroactively alter the definition of crimes or increase the punishment for criminal acts."). It is well-settled that the *ex post facto* prohibition applies not to civil regulatory regimes but to criminal laws or laws that are punitive in intent or effects. *See Kansas v. Hendricks*, 521 U.S. 346, 369–70, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997) (holding that a state's civil commitment statute was nonpunitive and not a criminal proceeding, "thus remov[ing] an essential prerequisite for ... *ex post facto* claims"). Contrary to the Plurality's view, it simply is not enough, for *ex*

*post facto* purposes, that retroactive application of the 2009 and 2010 amendments to Maryland's sex offender registration law "alters the situation of a party to his disadvantage." *See Doe v. Dep't of Public Safety and Corr. Servs.*, 430 Md. 535, 559–60, 62 A.3d 123, 137–38 (2013).

The test the Plurality puts forward for detecting an *ex post facto* law is drawn largely from *Anderson v. Department of Health and Mental Hygiene. See Doe*, 430 Md. at 553–54, 62 A.3d at 133–34; *see also id.* at 556, 62 A.3d at 135 (describing the test as follows: "[t]wo critical elements must be present for a criminal or penal law to be *ex post facto:* it must be retrospective ... and it must *disadvantage* the offender affected by it." (citations omitted)). There are two problems, as I see it, with employing in the present case the test used in *Anderson.*

The *Anderson* Court, relying on *Kring v. Missouri,* 107 U.S. 221, 2 S.Ct. 443, 27 L.Ed. 506 (1883), and its progeny, concluded that "a law passed after the commission of a criminal act, affecting substantial rights, and changing the consequences of having committed the criminal act in a way that is disadvantageous to the defendant, falls within the *ex post facto* prohibition." *Anderson,* 310 Md. at 227, 528 A.2d 904. The Supreme Court, however, no longer embraces *Kring's* expansive view of what is prohibited by the *Ex Post Facto* Clause. In *Collins v. Youngblood,* the Court expressly overruled *Kring,* particularly the conclusion in that case that the *Ex Post Facto* Clause reaches "any change which 'alters the situation of a party to his disadvantage.' " [2] 497 U.S. at 50,

---

**2.** Following *Collins v. Youngblood,* the Supreme Court made clear that the progeny of *Kring,* also relied upon in our *Anderson* decision, are "inconsistent with the framework developed in *Collins." California Dep't of Corr. v. Morales,* 514 U.S. 499, 506 n. 3, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995). *Kring's* progeny, relied upon by the Plurality, include *Lindsey v. Washington,* 301 U.S. 397, 57 S.Ct. 797, 81 L.Ed. 1182 (1937), *Weaver v. Graham,* 450 U.S. 24, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981), and *Miller v. Florida,* 482 U.S. 423, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987). Though acknowledging as much, the Plurality continues to cite those cases as support for the continuing vitality of *Anderson. See Doe,* 430 Md. at 554–55, 62 A.3d at 134–35.

110 S.Ct. 2715; *see also Booth v. State,* 327 Md. 142, 171, 608 A.2d 162 (1992) (noting that *Collins* overruled *Kring* ). Rather, the Supreme Court reaffirmed that the scope of the *Ex Post Facto* Clause is limited to the types of legislative acts set forth by Justice Chase in *Calder v. Bull. Collins,* 497 U.S. at 49–50, 110 S.Ct. 2715; *see also Stogner,* 539 U.S. at 611–12, 123 S.Ct. 2446 (recognizing that *Calder v. Bull* provides "an authoritative account of the scope of the *Ex Post Facto* Clause"). Those categories are:

> 1st. Every law that makes an action done before the passing of the law, and which was *innocent* when done, criminal; and punishes such action.2d. Every law that *aggravates* a *crime,* or makes it *greater* than it was, when committed.3d. Every law that *changes the punishment,* and inflicts a *greater punishment,* than the law annexed to the crime, when committed. 4th. Every law that alters the *legal* rules of *evidence,* and receives less, or different, testimony, than the law required at the time of the commission of the offence, *in order to convict the offender.*

*Calder,* 3 U.S. at 390. *Anderson,* to the extent it relies on a now-discredited analysis and language that the Supreme Court abandoned two decades ago in *Collins,* should not guide the disposition of the present case.

Neither am I persuaded, as the Plurality is, that the post-*Collins* cases of this Court demonstrate a lineage of *ex post facto* decisions that demands our adherence in the present case to the *Kring/Anderson* test, under principles of *stare decisis.* In not one of the post-*Collins* cases cited in the Plurality opinion did this Court declare that the *ex post facto* caselaw in Maryland no longer takes into account, much less applies, the federal *ex post facto* analysis. Indeed, the Maryland *ex post facto* cases relied upon by the Plurality—*Demby, Khalifa, Frost, Gluckstern,* and *Anderson*—invoke in one way or another the notion that Article 17 and the *Ex Post Facto* Clause of the federal Constitution have essentially the same meaning.

I also dispute, for an entirely separate reason, the Plurality's reliance on the *Anderson* test, which asks whether a retrospective "criminal or penal law" operates to "disadvantage" the offender. *See Doe*, 430 Md. at 556–59, 62 A.3d at 135–37. The present case requires us to examine for a possible *ex post facto* problem what on its face is a civil, regulatory regime. Unlike the case at bar, the laws at issue in the post-*Collins* cases relied upon by the Plurality unquestionably come within "[t]he ambit of punishment, for *ex post facto* purposes," *see Demby*, 390 Md. at 610, 890 A.2d 310, as each one of those laws affected directly the length of an individual's sentence for a crime. *See id.* at 614–15, 890 A.2d 310 (COMAR amendments that terminated eligibility of certain inmates to earn special project diminution credits for double-celling); *Khalifa*, 382 Md. at 420 & n. 6, 855 A.2d 1175 (statutory amendments that increased the maximum sentence for abducting a child to a place outside the United States); *Frost*, 336 Md. at 137, 647 A.2d 106 (statutory amendments which entitled the Parole Commissioner to rescind all diminution credits at a revocation hearing). *See also Booth*, 327 Md. at 168–69, 608 A.2d 162 (statutory amendment that removed intoxication from the list of mitigating circumstances for the crime of first degree murder); *Gluckstern v. Sutton*, 319 Md. 634, 669, 574 A.2d 898 (1990) (statutory amendments that, when combined, made parole more difficult to obtain for Sutton). The Plurality opinion fails to demonstrate that the changes to Maryland's sex offender registration scheme are a "criminal or penal law," which remains a threshold element of the test upon which the Plurality relies.

This Court's analysis should focus on whether the law at issue affects not mere "consequences" but rather the "definition of crimes, defenses, or punishments," as that is the true concern of the *ex post facto* prohibition. *Collins*, 497 U.S. at 51, 110 S.Ct. 2715. In other words, "[a]fter *Collins*, the focus of the *ex post facto* inquiry is not on whether a legislative change produces some ambiguous sort of 'disadvantage,' . . . but on whether any such change alters the definition of

criminal conduct or increases the penalty by which a crime is punishable." *Morales,* 514 U.S. at 506–07 n. 3, 115 S.Ct. 1597.

*Smith v. Doe,* 538 U.S. 84, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003), provides the proper test for ascertaining whether a facially civil regulatory scheme is, in effect, criminal in the sense that it imposes "punishment," as that term is understood in *ex post facto* analysis. That case, which involved an *ex post facto* challenge to Alaska's Sex Offender Registration Act, also referred to as Alaska's "Megan's Law," lays out a two-part inquiry:

> We must "ascertain whether the legislature meant the statute to establish 'civil' proceedings." *Kansas v. Hendricks,* 521 U.S. 346, 361 [117 S.Ct. 2072, 138 L.Ed.2d 501] (1997). If the intention of the legislature was to impose punishment, that ends the inquiry. If, however, the intention was to enact a regulatory scheme that is civil and nonpunitive, we must further examine whether the statutory scheme is " 'so punitive either in purpose or effect as to negate [the State's] intention' to deem it 'civil.' " *Ibid.* (quoting *United States v. Ward,* 448 U.S. 242, 248–249 [100 S.Ct. 2636, 65 L.Ed.2d 742] (1980)).

538 U.S. at 92, 123 S.Ct. 1140 (alteration in original). This Court has expressly relied on this same two-part, "intent-effects" test to reject a due process challenge to the earlier version [3] of Maryland's sex offender registration law. *Young v. State,* 370 Md. 686, 711–13, 716, 806 A.2d 233 (2002) (holding that the obligation to register as a sex offender is "not punishment in the constitutional sense").[4] *Cf. Raines,* 383 Md.

---

**3.** As Judge Harrell points out, *Young v. State,* 370 Md. 686, 806 A.2d 233 (2002), analyzed the 2002 version of Maryland's sex offender registration statute, which was codified at Maryland Code (1957, 1996 Repl.Vol., 2000 Supp.) Article 27, § 792, but has since been amended and is now located at Maryland Code (2001, 2008 Repl.Vol., 2012 Supp.) §§ 11–701 through 11–727 of the Criminal Procedure Article ("CP"). *See Doe,* 430 Md. at 570 n. 1, 62 A.3d at 144 n. 1 (Harrell, J., concurring).

**4.** We pointed out in *Young* that, although the intent-effects test was gleaned from *United States v. Ursery,* 518 U.S. 267, 116 S.Ct. 2135, 135

at 28, 42, 857 A.2d 19 (applying the intent-effects test of *Smith v. Doe* and concluding that Maryland's DNA Collection Act is not an *ex post facto* law). Logic dictates, and settled caselaw supports, employing the intent-effects test of *Smith v. Doe* to resolve the *ex post facto* challenge being raised in the present case. Under that test, the current sex offender registration and notification regime survives the challenge.

The first, "intent" prong of the *Smith v. Doe* test requires the courts to inquire "whether the legislature, in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other." *Id.* at 93, 123 S.Ct. 1140 (quoting *Hudson v. United States*, 522 U.S. 93, 99, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997)). This is a matter of statutory construction, involving consideration of "the statute's text and its structure to determine the legislative objective." *Id.* at 92, 123 S.Ct. 1140. It is also relevant that, "where a legislative restriction 'is an incident of the State's power to protect the health and safety of its citizens,' it will be considered 'as evidencing an intent to exercise that regulatory power, and not a purpose to add to the punishment.'" *Id.* at 93–94, 123 S.Ct. 1140 (quoting *Flemming v. Nestor*, 363 U.S. 603, 616, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960)). Therefore, "even if the objective of [the law at issue] is consistent with the purposes of the [respective state's] criminal justice system, the State's pursuit of it in a regulatory scheme does not make the objective punitive." *Id.* at 94, 123 S.Ct. 1140. In other words, "[t]he location and labels of a statutory provision do not by themselves transform a civil remedy into a criminal one." *Id.*

---

L.Ed.2d 549 (1996) (a double jeopardy case) and *Kansas v. Hendricks*, 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997) (involving both *ex post facto* and double jeopardy challenges), the test is applicable in the due process context to determine whether a law constitutes "punishment." *Young*, 370 Md. at 711–12 n. 11, 806 A.2d 233. I see no reason why the converse should not be true in Maryland, i.e., that the test we used in the due process context to determine whether a law is punishment applies equally in the *ex post facto* context. Indeed, it makes no sense *not* to apply the same test in both situations, as the Supreme Court did in *Smith v. Doe*, 538 U.S. 84, 97, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003). *See also infra* note 6.

For example, in *Smith v. Doe,* the Supreme Court explained that the Alaska legislature's placement of the sex offender registration provisions in that state's Code of Criminal Procedure, where other nonpunitive provisions also were placed, "is not sufficient to support a conclusion that the legislative intent was punitive." *Id.* at 95, 123 S.Ct. 1140. The Court therefore held that Alaska's sex offender registration and notification law did not violate the federal *Ex Post Facto* Clause because the primary purpose of the statute was not to impose punishment but rather to enact a civil regulatory scheme. *Id.* at 105–06, 123 S.Ct. 1140.

If a reviewing court concludes that the legislative intent in enacting the scheme is nonpunitive, then the second, "effects" part of the *Smith v. Doe* test requires the court to determine whether, notwithstanding that the legislation is intended to be civil, its effects are so punitive that they negate its civil purpose. The Supreme Court identified a number of "guideposts" to assist in answering that question with respect to a sex offender registration law:

> The factors most relevant to our analysis are whether, in its necessary operation, the regulatory scheme: has been regarded in our history and traditions as a punishment; imposes an affirmative disability or restraint; promotes the traditional aims of punishment; has a rational connection to a nonpunitive purpose; or is excessive with respect to this purpose.

*Id.* at 97, 123 S.Ct. 1140. Yet, "[b]ecause we ordinarily defer to the legislature's stated intent, *only the clearest proof* will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Id.* at 92, 123 S.Ct. 1140 (emphasis added) (citations and internal quotation marks omitted). For that reason, this second, "effects" step in the analysis is a "steep one for those challenging a statute on [*ex post facto*] grounds." *United States v. W.B.H.,* 664 F.3d 848, 853–54 (11th Cir.2011), *cert. denied,* —— U.S. ——, 133 S.Ct. 524, 184 L.Ed.2d 339 (2012). Reasoned application of this two-part, intent-effects test yields for me the conclusion that retroactive application of the 2009 and 2010

amendments to Maryland's sex offender registration scheme does not render it an *ex post facto* law.

With regard to the first, "intent" part of the test, I am convinced that the General Assembly did not intend the 2009 and 2010 amendments to be punitive, but rather intended the amendments to accomplish two public-safety, regulatory ends. The General Assembly obviously intended to incorporate the provisions of the federal Sex Offender Registration and Notification Act (SORNA), 42 U.S.C. § 16901 *et seq.*, enacted in 2006.[5] The legislature also intended to further the objectives of the then-extant civil regulatory scheme this Court previously held to be nonpunitive.[6] *Young*, 370 Md. at 712, 806 A.2d

---

5. The express purpose of SORNA (Title I of the Adam Walsh Child Protection and Safety Act of 2006) is "to protect the public from sex offenders and offenders against children" through "a comprehensive national system for the registration of those offenders." 42 U.S.C. § 16901 (2006). Congress directed the Attorney General to decide if SORNA's registration requirements apply to sex offenders convicted before its passage. 42 U.S.C. § 16913(d). The Attorney General determined that those requirements "apply to all sex offenders, including sex offenders convicted of the offense for which registration is required prior to the enactment of that Act." 28 C.F.R. § 72.3 (2007).

6. I have mentioned that *Young* involved a due process challenge to Maryland's then-current sex offender registration statute. Much of the analysis of the claim in *Young* is pertinent to the *ex post facto* analysis insofar as both analyses look to the relevant factors noted in *Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 168–69, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963). In *Smith v. Doe,* the Supreme Court explained that the *Mendoza–Martinez* factors,

> which migrated into our *ex post facto* case law from double jeopardy jurisprudence, have their earlier origins in cases under the Sixth and Eighth Amendments, as well as the Bill of Attainder and the *Ex Post Facto* Clauses. Because the *Mendoza–Martinez* factors are designed to apply in various constitutional contexts, we have said they are "neither exhaustive nor dispositive" but are "useful guideposts."

538 U.S. at 97, 123 S.Ct. 1140 (internal citations omitted). *See also Young*, 370 Md. at 713, 806 A.2d 233 ("In making the determination of whether § 792 has a punitive effect despite its regulatory intent, we look to the *Mendoza–Martinez* factors for guidance."). The factors listed in *Mendoza–Martinez* are:

> Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of *scienter*, whether its operation will promote the traditional aims of punishment—retribution and

233 ("[T]he plain language and overall design of [the statute] clearly indicate that it was not intended as punishment, but rather was intended as a regulatory requirement aimed at protection of the public.").

The 2009 and 2010 amendments to the Maryland sex offender registration law in large measure respond directly to SORNA.[7] *See* Dep't of Leg. Servs., Fiscal and Policy Notes Revised, S.B. 854 and H.B. 936 at 1 (Md. General Assembly, 2010 Reg. Sess.) ("This Administration bill makes changes to notification and registration provisions of Maryland's sexual offender laws to conform to the federal Sex Offender Registration and Notification Act (SORNA) . . . ."); Fiscal and Policy Note Revised, S.B. 425 at 2–3 (Md. General Assembly, 2009 Reg. Sess.) (noting that SORNA "requires conformity by the

---

deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned . . . .

*Id.* at 168–69, 83 S.Ct. 554 (footnotes omitted).

**7.** SORNA authorizes a mechanism for instructing jurisdictions to "recapture" several categories of sex offenders. *See* Dep't of Justice, Sex Offender Registration and Notification Act Substantial Implementation Checklist, Part VII, indicating that a jurisdiction should recapture three categories of offenders, including "[t]hose who are: Incarcerated or under supervision, either for the predicate sex offense or for some other crime. Already registered or subject to a pre-existing sex offender registration requirement under the jurisdiction's law. Reentering the jurisdiction's justice system because of conviction for some other crime (whether or not a sex offense)." *See also* The National Guidelines for Sex Offender Registration and Notification, 73 Fed.Reg. 38,030, 38,063 (July 2, 2008) ("Jurisdictions are specifically required to register such sex offenders if they remain in the system as prisoners, supervisees, or registrants, or if they later reenter the system because of conviction for some other crime (whether or not the new crime is a sex offense).").

The failure of a jurisdiction to implement SORNA can result in the loss of 10% of the Byrne Justice Assistance grants that would have otherwise been allocated to the State. 42 U.S.C. § 16925. The retroactivity provisions of Maryland's sex offender registration scheme in CP § 11–702.1, a result of the 2010 amendments, closely match these classes of sex offenders to be "recaptured." This, in my view, is further evidence that the General Assembly enacted the retroactivity provision of the Maryland scheme not to punish the offender but, in part at least, to maintain federal funding.

states with various aspects of sex offender registration provisions" of SORNA and describing the potential consequences of failing to comply with SORNA).

Notably, every federal court of appeal that, to date, has been asked to examine the question has rejected an *ex post facto* challenge to SORNA. *See United States v. Felts,* 674 F.3d 599, 606 (6th Cir.2012) (pointing out the "unanimous consensus among the circuits that SORNA does not violate the Ex Post Facto Clause"). In so holding, many courts have noted the civil or remedial intent of that statute. *See, e.g., United States v. Elkins,* 683 F.3d 1039, 1044–45 (9th Cir.2012) ("Elkins does not question that Congress, in enacting SORNA, intended to create a regulatory scheme, and we recognize that SORNA was created for the purpose of establishing a national system for the registration of sex offenders."); *W.B.H.,* 664 F.3d at 854–55, 860 (stating that Congress's intent in enacting SORNA was "not to punish former sex offenders for their past crimes but to promote public safety by providing citizens with information about the whereabouts of sex offenders and assisting law enforcement in locating them"); *United States v. Leach,* 639 F.3d 769, 773 (7th Cir.2011) (observing that SORNA "is, in fact, regulatory"); *United States v. Young,* 585 F.3d 199, 204–06 (5th Cir.2009) (per curiam) ("Congress sought to create a civil remedy.").

The features of Maryland's current registration law, although not identical to SORNA, are in material respect sufficiently like the federal act and reflect the General Assembly's civil regulatory intent in enacting the 2009 and 2010 amendments. Like SORNA, *see* 42 U.S.C. §§ 16915, 16916, Maryland requires Tier III offenders, such as Petitioner, to register in person every three months for life, Md.Code (2001, 2008 Repl.Vol., 2012 Supp.) § 11–707(a)(2), (4) of the Criminal Procedure Article ("CP"). SORNA allows officials to take a current photo of the registrant during each in-person verification, 42 U.S.C. § 16916; the Maryland law requires an updated photograph of all registrants to be taken every 6 months, CP § 11–707(a). SORNA requires registrants to notify at least one jurisdiction in which they are registered in person

within three days of any change to the registrant's name, residence, employment, or student status. 42 U.S.C. § 16913(c). Maryland similarly requires a registrant to notify local law enforcement in person within three days of any commencement or termination of enrollment or employment in an institution of higher education, CP § 11–705(f); to provide written notice of a legal change of name, CP § 11–705(g); and to notify local law enforcement within three days of changes in "(1) residence; (2) the county in which the registrant habitually lives; (3) vehicle or license plate information; (4) electronic mail or Internet identifiers; (5) home or cell phone numbers; or (6) employment," CP § 11–705(e). *See also* CP § 11–705(j) (requiring written notice to State registry within three days of establishment of new "electronic mail address, computer log-in or screen name or identity, instant-message identity, or electronic chat room identity"). Maryland provides for online dissemination of certain registration information, not excluding the registrant's photograph, CP § 11–717, as does SOR-NA, 42 U.S.C. § 16918. SORNA requires that states provide a criminal penalty for a registrant's failure to comply with these requirements, *see* 42 U.S.C. § 16913(e), and the Maryland scheme creates such a penalty, *see* CP § 11–721.

That the current Maryland sex offender registration law imposes upon registrants certain additional requirements [8] not found in SORNA does not dictate, for me, a different conclu-

---

**8.** Under the Maryland scheme, the registrant must notify local law enforcement at least three days before leaving the United States to commence residence or employment or attend school in a foreign country. CP § 11–705(h). The Maryland scheme also requires the registrant to notify law enforcement (in person or in writing) prior to obtaining a temporary residence or altering the location where the registrant resides or habitually lives for more than five days or being absent from the location where the registrant resides or habitually lives for more than seven days. CP § 11–705(i). Notice must include the temporary address or location where the registrant will reside or live and contain the anticipated dates of absence. *Id.* Other than for voting purposes, the registrant is prohibited from knowingly entering school property and day care facilities unless the registrant is a student or parent of a student and obtains prior permission or promptly notifies a school official. CP § 11–722. Violation of the latter provision is a misdemeanor. *Id.*

sion with respect to the General Assembly's intent in enacting the law. To my mind, none of these features of the Maryland scheme focus directly on deterrence and retribution, two of the traditional aims of criminal punishment, and none turns on a finding of *scienter,* which is a hallmark of many criminal laws. Neither, for that matter, does the fact that there is a criminal punishment for failing to register make the registration regime punitive. *See Smith v. Doe,* 538 U.S. at 95–96, 123 S.Ct. 1140 (noting that civil regimes may impose criminal penalties for violating the regime's regulatory requirements). Finally, the requirements of prior notification to law enforcement of even a temporary change of residence and of seeking permission before entering a school, though onerous, likewise do not undermine the otherwise clear legislative purpose of protection of the public. In short, as I see it, the Maryland sex offender registration law is not punitive under the first, "intent" step of the *Smith v. Doe* analysis.

The Maryland sex offender registration law, in my view, also passes constitutional muster under the second, "effects" step of *Smith v. Doe.* Put simply, Petitioner has not met his burden to establish by the "clearest proof" that the Maryland law transforms what is obviously a civil remedy into a criminal penalty. To be sure, Maryland's current sex offender registration law includes requirements that were not provided by either Alaska's Megan's Law reviewed by the Supreme Court in *Smith v. Doe* or the earlier version of the Maryland sex offender law this Court reviewed in *Young. See supra* note 3. That the requirements imposed under the current civil registration regime are more burdensome than at the time of the registrant's conviction and the dissemination provisions work to the "disadvantage" of the registrant, as the Plurality asserts, does not mean that retrospective application of those requirements renders the Maryland scheme an *ex post facto* law. As I have noted, the "disadvantage" language that once played a key role in the *ex post facto* analysis no longer does so; instead it is the intent-effects test of *Smith v. Doe* that pertains.

The factors most relevant to this part of the analysis are drawn from among the seven *Mendoza–Martinez* factors, *see supra* note 6, and are "whether, in its necessary operation, the regulatory scheme: has been regarded in our history and traditions as a punishment; imposes an affirmative disability or restraint; promotes the traditional aims of punishment; has a rational connection to a nonpunitive purpose; or is excessive with respect to this purpose." *Smith v. Doe,* 538 U.S. at 97, 123 S.Ct. 1140. Applying those factors to the current Maryland sex offender registration scheme produces, for me, the following conclusions. First, although the Plurality is deeply troubled by the use of the Internet to maintain the publicly-accessible registry, *see Doe,* 430 Md. at 564–68, 62 A.3d at 140–43, I see no merit in the contention that the online posting of information concerning the registrant's conviction, his photograph, residence, etc., amounts to public humiliation and shaming, a traditional characteristic of punishment. Indeed, any such argument fails in light of what this Court and the Supreme Court have had to say on the subject. We observed in *Young* that, although public dissemination of one's criminal history certainly has some negative consequences, "dissemination of such information in itself has not historically been regarded as punishment when done in furtherance of a legitimate government interest." 370 Md. at 714, 806 A.2d 233. *See also Smith v. Doe,* 538 U.S. at 98, 123 S.Ct. 1140 ("[T]he stigma of Alaska's Megan's Law results not from public display for ridicule and shaming but from the dissemination of accurate information about a criminal record, most of which is already public."). That the means chosen by Congress [9] and the General Assembly to disseminate this information now involves making the registry available online for public access does not render the dissemination punitive in

---

9. SORNA requires jurisdictions to "make available on the Internet, in a manner that is readily accessible to all jurisdictions and to the public, all information about each sex offender in the registry." 42 U.S.C. § 16918. I have mentioned that no federal court of appeal has found that this or any other feature of SORNA renders the federal scheme punitive in its effects.

effect or akin to public shaming. *See id.* at 99, 123 S.Ct. 1140 (noting that, although "the geographic reach of the Internet is greater than anything which could have been designed in colonial times," "[w]idespread public access is necessary for the efficacy of the scheme, and the attendant humiliation is but a collateral consequence of a valid regulation").

The same rationale holds for the provision of the current Maryland law permitting community members to request email notification when an offender is released from incarceration in his or her county. *See* CP § 11–717(d); *Smith v. Doe,* 538 U.S. at 105, 123 S.Ct. 1140 (noting that the online registry at issue was passive; information available on the Internet must be sought out by one who desires access to it). It is simply a fact of present-day society that the Internet is one of the most efficient and effective ways to disseminate information; as such, the use of the Internet in this way further supports the conclusion that "[t]he purpose and the principal effect of notification are to inform the public for its own safety." *Id.* at 99, 123 S.Ct. 1140.

Neither, to my mind, does the current Maryland law necessarily constitute an "affirmative disability or restraint," as that term is understood in *ex post facto* law. First, the Maryland law "imposes no physical restraint, and so does not resemble the punishment of imprisonment, which is the paradigmatic affirmative disability or restraint." *Id.* at 100, 123 S.Ct. 1140 (citing *Hudson,* 522 U.S. at 104, 118 S.Ct. 488). Furthermore, the obligations of the Maryland scheme are "less harsh than the sanctions of occupational debarment, which [the Supreme Court has] held to be nonpunitive." *Id.* at 100, 123 S.Ct. 1140. Reporting in person at designated intervals certainly can prove inconvenient, even burdensome; it does not follow, though, that requiring this of the registrant is punitive. *See ACLU v. Masto,* 670 F.3d 1046, 1056 (9th Cir.2012) (holding that a Nevada law implementing SORNA was not punitive under the *Smith v. Doe* test).

Likewise nonpunitive in their effects are the requirements of providing advance notice of travel and temporary change of

residence, and the restrictions on knowingly entering school property and day care facilities. But even if I were to grant that these requirements constitute affirmative disabilities or restraints because they adversely affect a registrant's ability to travel or attend his or her child's school activities, that conclusion alone would not render the current registration scheme, taken as a whole, punitive in effect. *See Young,* 370 Md. at 713, 806 A.2d 233 (observing that the "affirmative disability or restraint" factor weighed in the petitioner's favor, but ultimately concluding that the statute was not punitive).

Furthermore, the registration and notification features of the current scheme have a rational connection to the regulatory purpose of the legislative scheme. That there exists evidence of a strong connection between the features of a regulatory scheme and the obvious, nonpunitive legislative purpose behind that law is a "[m]ost significant" factor in the analysis. *Smith v. Doe,* 538 U.S. at 102, 123 S.Ct. 1140 (alteration in original) (quoting *United States v. Ursery,* 518 U.S. 267, 290, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996)).

The duration of the registration and notification requirements and the nature of what information must be reported are rationally connected to the public safety purpose of the Maryland law; so too is the feature of the law that classifies offenders in tiers based on the nature of the underlying conviction, rather than an individualized assessment. As was true of Alaska's Megan's Law, considered in *Smith v. Doe,* the "broad categories," the "corresponding length of the reporting requirement," and the notification features of the Maryland law are "reasonably related to the danger of recidivism, and this is consistent with the regulatory objective." 538 U.S. at 102, 123 S.Ct. 1140; *see id.* at 104, 123 S.Ct. 1140 ("The State's determination to legislate with respect to convicted sex offenders as a class, rather than require individual determination of their dangerousness, does not make the statute a punishment under the *Ex Post Facto* Clause.").

As for the last factor of the "effects" part of the analysis, I conclude that the features of Maryland's current sex offender

registration scheme are not excessive when considered in light of the law's public safety purpose. In considering this factor, I have borne in mind the Supreme Court's caution in *Smith v. Doe* that a reviewing court may not substitute its judgment for that of the General Assembly. The Court explained in this regard: "The excessiveness inquiry of our *ex post facto* jurisprudence is not an exercise in determining whether the legislature has made the best choice possible to address the problem it seeks to remedy. The question is whether the regulatory means chosen are reasonable in light of the nonpunitive objective." *Id.* at 105, 123 S.Ct. 1140.

Finally, even if I were to consider it a "close call" as to whether the current Maryland scheme were punitive in its effects, I would be bound in that instance to defer to the General Assembly. In *Smith v. Doe,* Justice Souter disagreed with the Court that the "civil indications" of the Alaska legislature's intent in enacting that state's Megan's Law outweigh the indications of that law's "punitive character," but he ultimately concurred in the judgment upholding the constitutionality of the law. *Id.* at 110, 123 S.Ct. 1140 (Souter, J., concurring in the judgment). He observed that "the substantial evidence does not affirmatively show with any clarity that the Act is valid," yet he concluded that "[w]hat tips the scale for me is the presumption of constitutionality normally accorded a State's law," which "gives the State the benefit of the doubt in close cases like this one." *Id.* That same rationale applies here.

For all these reasons, the 2009 and 2010 amendments to the Maryland scheme do not in their effects constitute punishment. It follows, then, that retroactive application of those requirements does not constitute an *increase* in punishment, which, of course, is the essence of an *ex post facto* law. In coming to the contrary conclusion, the Plurality mistakenly relies upon a now-discredited test to analyze the constitutionality of the current sex offender registration provisions. Furthermore, in the end, the result reached by the Majority of the Court intrudes upon the prerogative of the General Assembly to make a law that does not violate either the Constitution of

the United States or the Constitution of Maryland and the Declaration of Rights.

In my assessment, proper application of the test for *ex post facto* espoused by the Supreme Court in *Smith v. Doe* and in recent Maryland cases leads to but one conclusion. I would hold that, because the statute is nonpunitive in either intent or effects, its retroactive application to Petitioner and others similarly situated does not violate the *Ex Post Facto* Clause of the United States Constitution or the *ex post facto* prohibition of Article 17.

II.

Petitioner separately argues that the Maryland sex offender registration scheme violates his right to due process. I agree with Judge Harrell that this contention has no merit. Indeed, it seems to me that *Connecticut Dep't of Public Safety v. Doe*, 538 U.S. 1, 123 S.Ct. 1160, 155 L.Ed.2d 98 (2003), decided the same day as *Smith v. Doe*, controls and completely disposes of Petitioner's contention. In that case, a convicted sex offender argued that, by being required to register as a sex offender under Connecticut's Megan's Law, he was being deprived of a liberty interest—his reputation and status in the community—without being afforded a hearing on his individual level of dangerousness, as he claimed is required by the Due Process Clause. *Id.* at 6, 123 S.Ct. 1160. In rejecting that claim, the Supreme Court observed that "mere injury to reputation," which is the type of injury Petitioner claims here, "does not constitute the deprivation of a liberty interest" that is subject to due process protections. *Id.* at 6–7, 123 S.Ct. 1160; *see Paul v. Davis*, 424 U.S. 693, 711–12, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) (an interest in reputation is "quite different from the 'liberty' or 'property'" interests recognized in Supreme Court decisions and "is neither 'liberty' nor 'property' guaranteed against state deprivation without due process of law."). The Court decided that, even if a liberty interest were implicated, the statute mandates that all sex offenders register by virtue of their convictions alone, regardless of individual dangerousness, and "due process does not entitle [a person] to a

hearing to establish a fact that is not material under the [state] statute." *Connecticut Dep't of Public Safety v. Doe,* 538 U.S. at 7, 123 S.Ct. 1160. As with the law at issue in *Connecticut Dep't of Public Safety v. Doe,* Maryland's registration requirement for a child sexual offender is triggered by "conviction alone," rather than a determination of dangerousness. *See* CP § 11–704(a). The requirement applies to all persons convicted of specified sexual offenses and does not purport to make any distinction among registrants based on who might or might not be a continuing threat to public safety.

A number of courts around the country have followed *Connecticut Dep't of Public Safety v. Doe* to hold that their respective sex offender registration laws, similar to Maryland's, do not offend due process. *See Doe v. Michigan Dep't of State Police,* 490 F.3d 491, 498 (6th Cir.2007); *Doe v. Moore,* 410 F.3d 1337, 1342, 1345–46 (11th Cir.2005); *Doe v. Miller,* 405 F.3d 700, 709, 711–16 (8th Cir.2005); *Fullmer v. Michigan Dep't of State Police,* 360 F.3d 579, 582–83 (6th Cir.2004); *Milks v. State,* 894 So.2d 924, 926 (Fla.2005); *People v. Stanley,* 369 Ill.App.3d 441, 307 Ill.Dec. 689, 860 N.E.2d 343, 351–52 (2006). I would hold likewise that Maryland's sex offender registration law does not violate Petitioner's right to due process.

### III.

Petitioner argues that, by application of Maryland Rule 4–243 and this Court's decision in *Cuffley v. State,* 416 Md. 568, 7 A.3d 557 (2010), he is entitled not to have to abide by the requirements of the current sex offender registration law because compliance with those unforeseen requirements was not included as a term of the plea. Judge Harrell agrees with Petitioner; I do not.

Maryland Rule 4–243(c) requires that the prosecutor and defense attorney "advise the judge of the terms of the agreement." The judge may then accept or reject the plea but, if the agreement is approved, "the judge shall embody in the

judgment the agreed sentence, disposition, or other judicial action encompassed in the agreement or, with the consent of the parties, a disposition more favorable to the defendant than that provided for in the agreement." Md. Rule 4–243(c)(1), (3). "Rule 4–243 requires strict compliance with its provisions." *Cuffley*, 416 Md. at 582, 7 A.3d 557.

In *Cuffley*, we considered whether a judge violated the terms of a plea agreement by imposing a sentence above the guidelines range, and suspending all but part of it, when the plea agreement called for a sentence "within the guidelines." *Id.* at 573, 7 A.3d 557. In reviewing the plea agreement, we noted that "the meaning of the *sentencing term* of a binding plea agreement must be resolved by resort *solely* to the record established at the Rule 4–243 plea proceeding." *Id.* at 582, 7 A.3d 557 (first emphasis added). The goal is "to determine what the defendant reasonably understood to be the sentence the parties negotiated and the court agreed to impose." *Id.* The standard is an objective one, grounded in "what a reasonable lay person in the defendant's position and unaware of the niceties of sentencing law would have understood the agreement to mean, based on the record developed at the plea proceeding." *Id.* "When a defendant's guilty plea rests in part on a promise concerning disposition, and the State or the court violates that promise, 'the accused may obtain redress by electing either to have his guilty plea vacated or to leave it standing and have the agreement enforced at resentencing.' " *Id.* at 580–81, 7 A.3d 557 (quoting *State v. Brockman*, 277 Md. 687, 694, 357 A.2d 376 (1976)). We held in *Cuffley* that the court breached the plea agreement by imposing a sentence outside the agreed-upon guidelines range. *Id.* at 586, 7 A.3d 557.

Judge Harrell stretches the rule of *Cuffley* to reason that, because sex offender registration was *not* a term of Petitioner's plea agreement, he should not be required to comply with current sex offender registration requirements. *Cuffley* plainly does not apply to the case before us. *Cuffley* and the rule emanating from it focus on "the meaning of the *sentencing*

*term,*" and "what the defendant reasonably understood to be the *sentence.*" *Id.* at 582, 7 A.3d 557 (emphasis added).

A sentencing court does not impose sex offender registration as part of the sentence. *See* Md. Rule 4–243(c)(3) (directing that "the judge shall embody in the judgment the agreed sentence, disposition, or other judicial action"). Because the Supreme Court in *Smith v. Doe* and this Court in *Young* have held that sex offender registration is not punishment, it follows that imposing it on a defendant does not make the registration requirement a part of the sentence. On this point Judge Harrell surely must agree, given his reasons for why, in his view, Maryland's current sex offender registration scheme is neither an *ex post facto* law nor in violation of Petitioner's right to due process.

The requirements of the registration regime generally are triggered automatically by operation of law, once the defendant is convicted of a qualifying crime.[10] Petitioner was convicted of child sexual abuse, a crime that now requires automatic registration. *See* CP §§ 11–701(q) (defining Tier III offenders), 11–702.1 (retroactivity provision), 11–704 (requiring registration of specified offenders) and § 3–602 of the Criminal Law Article. The requirements have full force and effect without their being imposed as part of the sentence for the underlying crime. And the sentencing court does not possess the authority to declare that a convicted sex offender, other-

---

**10.** The current version of Maryland's sex offender registration statute makes registration mandatory in most instances. There are exceptions, however, to this rule. A juvenile who has been adjudicated delinquent for certain acts may be required to register if the juvenile was at least 13 years old at the time of the act and is now at least 18; the State's Attorney or the Department of Juvenile Services requests registration; and the court determines by clear and convincing evidence, following a hearing, that the juvenile is at significant risk of committing an offense that is sexually violent or requires registration as a Tier II or Tier III sex offender. *See* CP § 11–704(c). Another instance of discretion occurs when a person has been convicted of kidnapping and the victim is an adult. In that instance, the person is only classified as a Tier III sex offender and required to register if ordered to do so by the court. *See* CP §§ 11–701(q)(1)(iv), 11–704(a) and § 3–502 of the Criminal Law Article. Neither of these exceptions applies in the case before us.

wise obligated to comply with the requirements of Maryland's registration regime, need not comply.

It follows that, if registration is not punishment and is imposed mandatorily by operation of law, then it is a collateral consequence of a plea agreement. The conclusion that sex offender registration is a collateral consequence is one that other courts have reached, as well. For instance, the Supreme Court of Idaho has held that the failure of the trial court to advise a defendant of sex offender registration requirements did not render his plea invalid. *Ray v. State*, 133 Idaho 96, 982 P.2d 931, 934 (1999). The *Ray* Court concluded that "sex offender registration is not a direct consequence of a guilty plea," in part because (as in Maryland) registration is a "consequence of conviction over which the district judge has no direct control." *Id.* at 935–36. The Supreme Court of Nevada confronted the same issue in *Nollette v. State*, 118 Nev. 341, 46 P.3d 87 (2002). The Nevada Court held that sex offender registration "is a collateral consequence of a guilty plea because it is not sufficiently punitive to have an immediate and direct effect on the defendant's range of punishment." *Id.* at 91.

The requirement that Petitioner register as a sex offender likewise had no effect on the ultimate range of punishment he faced upon conviction. Because sex offender registration is not punishment, but a collateral consequence of a conviction, it was not required to be included as part of Petitioner's plea agreement.[11] Judge Harrell not only misapprehends *Cuffley*

---

11. Maryland Rule 4–242(f), entitled "Collateral consequences of a plea of guilty, conditional plea of guilty, or plea of nolo contendere," currently requires that a defendant be advised that, by entering a plea to certain crimes, he or she shall have to register as a sex offender. That provision of the rule, however, became effective January 1, 2008, more than 18 months after Petitioner's 2006 plea hearing. Even were the rule in place at the time of Petitioner's plea, the rule makes plain that the court's failure to inform Petitioner of the registration requirement would not allow him to evade the registration requirements. *See* Md. Rule 4–242(f) ("The omission of advice concerning the collateral consequences of a plea does not itself mandate that the plea be declared invalid.").

as dictating a contrary result, but he also states incorrectly the relief available to Petitioner in such a situation. Judge Harrell concludes that the absence of the sex offender registration requirement entitles Petitioner to "specific performance of the plea agreement in this case." *Doe,* 430 Md. at 576, 62 A.3d at 147 (Harrell, J., concurring). Judge Harrell concludes that specific performance in Petitioner's case dictates that, for Petitioner (and presumably other similarly situated persons), the registration requirement simply does not apply.

Specific enforcement of the plea agreement, i.e., "the benefit of the bargain," is one of two options available to a defendant when "the record of the plea proceeding clearly discloses what the defendant reasonably understood to be the terms of the agreement." *Cuffley,* 416 Md. at 583, 7 A.3d 557. The other option is for the defendant to withdraw his plea. Unlike in *Cuffley,* however, this is not a situation where a defendant bargained for a particular sentence—and had that plea agreement accepted by the court—only to receive a different sentence.

The State and the Court made no promises in the plea agreement or during the plea hearing that Petitioner would not have to register as a sex offender. Indeed, the plea agreement is silent on the matter, which was acceptable under the law, given the collateral nature of the registration requirement. Because there was no agreement with Petitioner that he would not be subject to the collateral consequence of registration as a sex offender, either at the time of the plea or at some future time, it follows that there was no "breach" of the agreement entitling him to the relief he now seeks.

## IV.

For these reasons, I respectfully dissent. I would affirm the judgment of the Court of Special Appeals.